# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Barion S.*, 2012 IL App (1st) 113026

---

| | |
|---|---|
| Appellate Court Caption | *In re* BARION S., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Sabrina L., Respondent-Appellant). |
| District & No. | First District, Fifth Division<br>Docket No. 1-11-3026 |
| Rule 23 Order filed<br>Rule 23 Order<br>withdrawn<br>Opinion filed | November 2, 2012<br><br>December 13, 2012<br>December 21, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The trial court's adjudication that respondent's child was neglected based in part on a diagnosis that the child suffered from a nonorganic failure to thrive was reversed and the cause was remanded for the entry of an order dismissing the petition and discharging the child from custody, since the evidence failed to establish beyond a preponderance of the evidence that the child was neglected and the evidence rebutted the presumption of neglect based on the diagnosis of failure to thrive. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-JA-00579; the Hon. Nicholas Geanopoulos, Judge, presiding. |
| Judgment | Reversed and remanded. |

| | |
|---|---|
| Counsel on Appeal | Abisi C. Cunningham, Jr., Public Defender, of Chicago (Janet Stewart, Assistant Public Defender, of counsel), for appellant. |
| | Anita M. Alvarez, State's Attorney, of Chicago (Alan J. Spellberg, Mary Needham, and Neanglea L. Marshall, Assistant State's Attorneys, of counsel), for the People. |
| | Robert F. Harris, Public Guardian, of Chicago (Kass A. Plain and Mary Brigid Hayes, of counsel), guardian *ad litem*. |
| Panel | PRESIDING JUSTICE McBRIDE delivered the judgment of the court, with opinion. |
| | Justices Howse and Taylor concurred in the judgment and opinion. |

**OPINION**

¶ 1    This case comes to us upon respondent's petition for rehearing. In the prior Rule 23 order, we dismissed the appeal for lack of jurisdiction based on the minor's argument that Supreme Court Rule 662 (Ill. S. Ct. R. 662(a) (eff. Oct. 1, 1975)) rendered respondent's appeal untimely. We have withdrawn our prior decision and issue this new opinion on rehearing.

¶ 2    Respondent Sabrina L. is the natural mother of minor Barion S., born April 16, 2009. On May 12, 2011, the trial court adjudicated Barion S. neglected due to a lack of care and an injurious environment. On September 22, 2011, the court found it was in the minor's best interest to be adjudged a ward of the court and that the mother was unable, for some reason other than financial circumstances alone, to care for, protect, train, and discipline the minor. Respondent appeals, arguing that the trial court's finding of neglect at the adjudicatory hearing was against the manifest weight of the evidence.

¶ 3    On July 2, 2010, the State filed a petition for adjudication of wardship, stating that Barion was a neglected minor whose environment was injurious to his welfare. 705 ILCS 405/2-3(1)(b) (West 2010). The petition alleged the following supporting facts.

  "Mother has one prior indicated report for failure to thrive. Mother has one other minor that is not in her care and/or custody. Minor is diagnosed with failure to thrive. This minor has a history of hospitalizations for his failure to thrive. On or about June 24, 2010, this minor was admitted to the hospital due to his failure to thrive. Minor gained weight on a regular diet during his hospitalization. Medical personnel opine that minor is at risk for long term developmental and medical consequences if his nutritional needs are not met."

¶ 4    On July 2, 2010, the trial court entered a temporary custody order, finding probable cause

existed that the minor was neglected, as alleged in the petition. Temporary custody was granted to the guardianship administrator with the Department of Children and Family Services (DCFS).

¶ 5 The adjudicatory hearing began on April 26, 2011. Karen Austin-Antoine testified that she was an investigator with the division of child protection for DCFS. She was assigned to Barion's case in June 2010 to investigate the allegation of a failure to thrive.

¶ 6 Austin-Antoine visited Barion at Stroger Hospital on June 8, 2010, and met with his treating physician, Dr. Risotto. Austin-Antoine spoke with respondent over the telephone on June 9, 2010. She spoke with respondent about the pending allegations. Respondent told Austin-Antoine that Barion had a feeding schedule. Respondent gave Barion breakfast at 8 a.m. and lunch at noon. Respondent described Barion as a "picky eater" and that "he would throw his food on the floor." Austin-Antoine stated that respondent gave examples of Barion's food, including oatmeal and applesauce.

¶ 7 Austin-Antoine also met with respondent at her home to do a home assessment. Austin-Antoine toured the entire apartment, which she observed was clean. In the kitchen, Austin-Antoine observed "an extreme amount of food." Austin-Antoine testified that respondent had "a lot of food in the refrigerator and freezer, but there was limited food for a toddler, specifically for a toddler." Austin-Antoine stated that she was looking for "cans of toddler food, Gerber food, graduate food, more foods that he could eat with hands that didn't have to be cooked, those type of foods, snacks for a minor–for a toddler." Austin-Antoine noted that she did see two cans of graduate food and there were some boxes of graduate food in the cabinet, "maybe two boxes of that." Austin-Antoine did not see any milk, formula or Pediasure. However, Austin-Antoine stated that Barion was on "table food" and that he "didn't have a specific diet. There was [*sic*] no limitations *** to his eating." Barion was not limited to graduate food.

¶ 8 Austin-Antoine testified that protective custody of Barion was taken on July 1, 2010, while he was in Stroger Hospital. DCFS received medical information that "the minor was losing weight while in the care of the mother, but there was no medical reason or diagnosis for the minor to lose weight." Barion's diagnosis was nonorganic failure to thrive. Austin-Antoine's assignment ended when protective custody was taken.

¶ 9 The State also sought to admit Barion's medical records from St. Bernard Hospital, the University of Chicago Comer Children's Hospital and Stroger Hospital, which the trial court allowed. The State published portions of these medical records for the record.

¶ 10 In March 2010, Barion was hospitalized at St. Bernard Hospital for malnutrition and fever. Barion was examined and later diagnosed with failure to thrive. The records from Stroger Hospital showed a hospitalization in April 2010 as well as three previous admissions for nonorganic failure to thrive. The records indicated that Barion's weight had fallen from between the 10th and 25th percentiles at birth to the 3rd percentile at 11 months. Respondent was instructed not to give Barion juice, give him only 12 ounces of milk per day, and to feed him solid foods. The records from Stroger Hospital also stated that Barion ate 80% to 100% of his meals and tolerated food well.

¶ 11 A report, dated July 2, 2010, by treating physician Dr. Michelle Lorand at Stroger

Hospital stated that Barion "continued to gain well at 30 to 40 grams per day average, which is over three to four times normal for age and evidence of good catch up growth with appropriate oral intake." Another report, date June 25, 2010, by Dr. Lorand stated, "Patient's mother does not appear to have the insight or parenting capacity to provide the child with adequate calories to maintain growth. This has nothing to do with viral illness in May or with led [*sic*] poisoning which he does not have. But mother is fixated on both of these things as a reason for his lack of weight gain with her." The report continued, "persistent non-organic FTT [failure to thrive], eats well, gains weight in the hospital but not with mother. *** [C]hild at risk for long-term developmental and medical consequences if his nutritional needs are not met. Developmentally impaired mother with possible psychiatric illness who appears to have poor insight and parenting capacity."

¶ 12    Sheila Lacy testified on respondent's behalf that she was the assigned intact case manager on Barion's case. She was assigned to the case from April 19, 2010, to July 5, 2010. Lacy stated that she was involved in the case because the DCFS hotline was called on March 13, 2010, from St. Bernard Hospital when respondent had taken Barion to the hospital for a fever and it was determined that Barion had lost weight. Medical neglect was reported for nonorganic failure to thrive. Lacy went to the minor's home for weekly visits to ensure that the minor was safe and the mother was complying with services. Lacy said she visited respondent's home between 7 and 10 times.

¶ 13    During the visits, Lacy went through each room to make sure there were no hazards. She also checked that there was food in the refrigerator, freezer and cabinets. Lacy made sure that respondent had updated WIC coupons and kept all her WIC, public aid and medical appointments.

¶ 14    Lacy also had the opportunity to supervise feedings. Lacy observed feedings on different dates at different times of the day. Lacy testified that she "felt that mom was feeding him properly. She had him in the high chair each time he needed to be fed as well as she assisted him if he tried to take the food out of his mouth." Lacy stated that respondent fed Barion in a quiet place and was focused on feeding him. Lacy would not have had respondent make any changes in the way Barion was fed. In May 2010, Lacy observed two instances involving Barion and food. Once, she saw Barion take the food out of his mouth as his mother was feeding him. The second time, Barion had vomited after respondent had fed him. Lacy stated that Barion ate slowly and respondent stayed focused on trying to feed him.

¶ 15    During her visits, Lacy observed that Barion did not have any marks on him outside of normal playing. She also stated that the apartment was clean every time.

¶ 16    Lacy testified that Barion went to the hospital twice in June 2010. She spoke with the medical professionals and respondent about Barion's care. Respondent asked to move from Stroger Hospital to a different hospital because she thought Stroger would not complete the medical testing that she thought Barion needed since he was not gaining weight. Lacy suggested La Rabida Hospital because it has a failure to thrive clinic and nutritionists. Stroger did not offer nutritionists. Respondent told Lacy that Barion's weight was fluctuating and was not feeding very well in the hospital.

¶ 17    On cross-examination, Lacy testified that she knew Barion had been hospitalized in

March 2010 at St. Bernard Hospital and diagnosed with a failure to thrive. Lacy was also aware that Barion had two visits to the University of Chicago Comer Hospital in May.

¶ 18    Lacy stated that it took respondent 40 to 45 minutes to feed Barion. Toward the middle to the end of feeding, Barion would start taking food out of his mouth and throw it on his high chair top. Lacy primarily saw Barion at lunch feeding and said respondent fed him chicken fingers, french fries, applesauce and juice. Lacy stated that she considered this appropriate food for lunch. Lacy testified that during the time period she visited Barion, she did not have any immediate and urgent concerns regarding his weight. Lacy said that respondent did not keep a food log so she did not know what Barion was fed when she was not present. Lacy also admitted that she made only one unscheduled visit.

¶ 19    Respondent also testified at the hearing. She stated that Barion was living with her sister. He was attending La Rabida Hospital for failure to thrive issues and she attended every visit.

¶ 20    Respondent stated that she first saw issues with Barion's growth when he was nine months old and she spoke with his pediatrician. She took him to St. Bernard Hospital and told the doctor he kept vomiting. She took him to the doctor three or four times for this issue, but it was not resolved. Respondent then took Barion to a different hospital, the University of Chicago Comer Hospital. Respondent switched hospitals because "the pediatrician didn't give [her] a diagnosis of what was going on, why was he steady throwing up and not holding his food down." She took Barion there three times, but he never spent the night at this hospital. Eventually, respondent took Barion to Stroger Hospital because she did not get a diagnosis and her "son was steady getting sick." Barion stayed overnight at Stroger two or three times and she stayed with him.

¶ 21    Respondent testified that while at Stroger, Barion was fed sometimes by a nurse and sometimes by her, but he continued to have some difficulties feeding. Respondent stated that at one point, Barion was prescribed ranitidine for acid reflux, but no one told her what the medication was for, so she did research about it online. Respondent said she was not happy with Barion's care at Stroger because she asked for him to receive an evaluation and see a nutritionist, but she did not receive any services. Respondent stated that Barion's weight was fluctuating while at Stroger, some days it would go up, other days it went down.

¶ 22    Respondent testified that when she fed Barion, he was in a high chair, without distractions in a quiet place. Barion was on table food and graduate food. Respondent stated that she had another child, her daughter Deja P., in her care in July 2010. Deja was three. Respondent said she always had full custody of Deja, but Deja would visit her father in Iowa. Respondent was in charge of feeding Deja. Respondent stated that she took Barion to seven different doctors and no one gave her a diagnosis. She was not informed of her son's condition. She said she had given birth to another child and has not had any problem feeding him or Deja.

¶ 23    On cross-examination, respondent said it took about 45 minutes to an hour to feed Barion because he was not eating. Barion would pick at the food and throw the food. Barion was able to swallow the food, but would vomit.

¶ 24    Respondent's attorney also published portions of Barion's medical records to the record. He noted Barion's daily weight while admitted in the hospital, which sometimes went up

slightly and sometimes went down slightly. He also read the appetite percentage meal eaten, which varied between 30% and 80% of the meal. The records stated that Barion was prescribed ranitidine. The records contained progress notes that discussed gastroesophageal reflux disease (GERD) as a possible contribution to Barion's weight issues. A progress note signed by a pediatrics resident from Stroger Hospital during Barion's admission in March to April 2010 stated, "GERD could be one of the possible reasons for this and also would explain the weight loss." A progress note during the same hospitalization from Dr. Lorand noted that "an organic cause, specifically GERD, may also play a role in [Barion's] drop in percentiles" and Barion's failure to thrive "may be due to both inadequate nutrition at home as well as GERD."

¶ 25     On May 12, 2011, following the close of evidence, the trial court adjudged Barion to be neglected, stating that the standard of proof at the adjudication hearing was a preponderance of the evidence, and after taking all things into consideration, the State proved the allegations of neglect based on a nonorganic failure to thrive. The court noted that section 2-18(2)(b) of the Juvenile Court Act of 1987 (Juvenile Court Act) states that proof that a minor has a medical diagnosis of failure to thrive syndrome is *prima facie* evidence of neglect. 705 ILCS 405/2-18(2)(b) (West 2010). The court found:

> "The one thing that does seem to be consistent though is that every time the child was admitted to the hospital, not on a daily basis but overall, his weight would go up. And then every time he was released from the hospital and the times he went back into mom's care, it does appear that his weight would go down."

¶ 26     On September 22, 2011, the trial court conducted a dispositional hearing. Sonya Baine testified that she was a child welfare specialist for DCFS and was assigned to Barion's case at the end of July 2011. Baine stated that Barion was two years old and living in a relative foster parent placement with his maternal aunt. Baine visited the placement and found it safe and appropriate with no signs of abuse or neglect. Barion was receiving weekly developmental therapy as well as monthly follow-up through La Rabida Clinic. Baine spoke with his developmental therapist and she reported to Baine that speech was Barion's biggest challenge. Barion started day care, which the therapist said would be good for Barion. The therapist was also working on Barion's independent and adaptive skills.

¶ 27     Baine also stated that Barion has been attending the failure to thrive clinic at La Rabida for at least nine months. Barion was within the 86th percentile for body weight. He was receiving medication for GERD and a supplement of Pediasure. The goal was for Barion to gain 10 grams a week, which Barion was exceeding. The foster parent was consistent in bringing Barion to his appointments and respondent attended all of the appointments as well.

¶ 28     Baine testified that respondent had supervised visitation with Barion three to five times a week. Baine has observed the visits and stated that the visits were safe and appropriate. Respondent and Barion appeared bonded to each other. The foster parent told Baine that respondent also helped with feeding Barion.

¶ 29     Baine stated that respondent was in individual therapy, which she attended consistently. Baine has spoken with respondent's therapist. The therapist was working with respondent's stress related to this case. Respondent also began meeting with a parenting coach. Baine had

also reviewed respondent's psychological evaluation, which indicated a diagnosis of adjustment disorder with anxiety and depressed mood. Respondent did not need medication for this diagnosis. Baine did not recommend any additional services.

¶ 30　　Baine recommended that Barion be adjudged a ward of the court "due to the issues that brought the case in as well as the services that are needed to reunite the family."

¶ 31　　On cross-examination, Baine stated that she had observed respondent with her two other children at home. The children appeared to be safe and clean and there have been no issues. Baine testified that Barion's weight still fluctuated, but overall, he had gained weight. Prior to Baine's assignment, respondent had completed a parenting class. Baine also recommended unsupervised visits three times a week for three hours.

¶ 32　　Following arguments, the trial court found that it was in Barion's best interest to be adjudged a ward of the court. The court stated that it would give the mother additional time to work toward getting Barion home and engaged in services and to resolve the issue of Barion's weight going forward. The court noted that respondent was "cooperative with services and visits go well. She is doing everything she's been asked to do." The court found that she was "unable only for some reason other than financial circumstances alone to care for, protect, train, discipline the child" at that time. The court terminated temporary custody and placed Barion in the custody and guardianship of D. Jean Ortega Piron, the DCFS Guardianship Administrator with the right to place the minor. The court also granted respondent's request for unsupervised visitation. The court set the permanency goal for the return home within 12 months.

¶ 33　　Respondent filed her notice of appeal on October 11, 2011.

¶ 34　　Initially, the minor challenges this court's jurisdiction over the appeal, arguing that respondent's appeal of the adjudication finding was untimely. "A reviewing court is obliged to examine its jurisdiction and to dismiss an appeal if it determines that it lacks the requisite jurisdiction." *Pestka v. Town of Fort Sheridan Co.*, 371 Ill. App. 3d 286, 293 (2007).

¶ 35　　In her notice of appeal, respondent listed the dates for both the adjudication and disposition orders. In her brief, respondent states that this court has jurisdiction over the appeal pursuant to Supreme Court Rules 660, 663, and 301. Ill. S. Ct. Rs. 660, 663 (eff. Oct. 1, 2001); R. 301 (eff. Feb. 1, 1994).

¶ 36　　Supreme Court Rule 663 is inapplicable to respondent's case because that rule governs an appeal from an order of the court empowering the guardian of the person of a minor to consent to the adoption of such a minor, which did not occur in the instant case. Ill. S. Ct. R. 663 (eff. Oct. 1, 2001). Supreme Court Rule 660(b) provides that appeals from final judgments under the Juvenile Court Act shall be governed by the rules applicable to civil cases. Ill. S. Ct. R. 660(b) (eff. Oct. 1, 2001). In juvenile cases, an adjudicatory order is generally not considered a final appealable order. *In re Janira T.*, 368 Ill. App. 3d 883, 891 (2006). Rather, the dispositional order is regarded as final and appealable as of right and the proper vehicle to appeal a finding of abuse or neglect. *In re Leona W.*, 228 Ill. 2d 439, 456 (2008). Supreme Court Rule 301 provides for the appeal of a final judgment in civil cases as of right. Ill. S. Ct. R. 301 (eff. Feb. 1, 1994). Where an appeal is appropriate under Rule 301, the notice of appeal must be filed within 30 days after entry of the final judgment from

which the appeal is being taken or 30 days after entry of the order disposing of any posttrial motions which may have been filed. Ill. S. Ct. R. 303(a)(1) (eff. May 30, 2008).

¶ 37 Supreme Court Rule 662 provides a procedure for appeals from adjudication orders. The minor asserts that respondent should have filed her appeal in compliance with Rule 662 and her failure to do so renders her current appeal untimely. Rule 662(a) provides that an appeal may be taken from an adjudication of wardship when the disposition order has not been entered within 90 days of the adjudication. Ill. S. Ct. R. 662(a) (eff. Oct. 1, 1975). Rule 662(c) further states that "[t]he notice of appeal in appeals under this rule shall be filed within 30 days after the expiration of the 90 days specified in this rule and not thereafter." Ill. S. Ct. R. 662(c).

¶ 38 However, the language of Rule 662 does not correspond to the proceedings under the Juvenile Court Act. Under section 2-22(1) of the Juvenile Court Act, the adjudication of wardship occurs at the dispositional hearing. 705 ILCS 405/2-22(1) (West 2010). Prior to 1984, the adjudication of wardship occurred at the adjudication hearing. Ill. Rev. Stat. 1983, ch. 37, ¶ 704-8. It was under this statutory procedure that the reviewing court in *In re Smith*, 80 Ill. App. 3d 380, 381 (1980), found Rule 662 to be "triggered" when more than 90 days passed between the adjudication of wardship and the disposition order.

¶ 39 Currently, at the adjudication hearing, the trial court determines whether the minor has been abused, neglected or dependent. 705 ILCS 405/2-21(1) (West 2010). Thus, an appeal under Rule 662(a) would never be filed because the adjudication of wardship would not occur before a disposition hearing. Rule 662(a) has never been amended to reflect the current procedure under the Juvenile Court Act. Accordingly, Rule 662 is not applicable to respondent's appeal. Since respondent filed her notice of appeal within 30 days of the entry of the dispositional order, a final and appealable order, we conclude that her appeal was timely.

¶ 40 As to the merits of the appeal, respondent argues that the trial court's finding of neglect at the adjudicatory hearing was against the manifest weight of the evidence. Respondent contends that neglect was not sufficiently proven because she sought medical attention for her son, stayed with him during hospitalizations, fed him properly, and kept food in the house. Respondent does not challenge the trial court's finding at the dispositional hearing that Barion be adjudged a ward of the court.

¶ 41 "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis*, and must be decided on the basis of their unique circumstances." *In re Arthur H.*, 212 Ill. 2d 441, 463 (2004). It is the State's burden to prove allegations of neglect by a preponderance of the evidence. *Arthur H.*, 212 Ill. 2d at 463-64. "In other words, the State must establish that the allegations of neglect are more probably true than not." *Arthur H.*, 212 Ill. 2d at 464. On appeal, "a trial court's ruling of neglect will not be reversed unless it is against the manifest weight of the evidence." *Arthur H.*, 212 Ill. 2d at 464. "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Arthur H.*, 212 Ill. 2d at 464. Further, "due to the 'delicacy and difficulty of child custody cases,' it is well settled ' "that wide discretion is vested in the trial judge to an even greater degree than any ordinary appeal to which the familiar manifest weight principle is applied." ' " *In re*

*Lakita B.*, 297 Ill. App. 3d 985, 994 (1998) (quoting *In re D.L.*, 226 Ill. App. 3d 177, 185 (1992), quoting *In re Martin*, 31 Ill. App. 3d 288, 293 (1975)).

¶ 42    Here, the trial court found Barion to be neglected because his environment was injurious to his welfare, pursuant to section 2-3(1)(b) of the Juvenile Court Act. 705 ILCS 405/2-3(1)(b) (West 2010). As the court noted, "proof that a minor has a medical diagnosis of failure to thrive syndrome is prima facie evidence of neglect." 705 ILCS 405/2-18(2)(b) (West 2010). However, this *prima facie* evidence only sets forth a rebuttable presumption that may be overcome by additional evidence. *In re Edward T.*, 343 Ill. App. 3d 778, 794-95 (2003) (citing *In re K.G.*, 288 Ill. App. 3d 728, 736 (1997), and *In re Edricka C.*, 276 Ill. App. 3d 18, 28 (1995)).

¶ 43    "The concept of 'neglect' is not static; it has no fixed and measured meaning, but draws its definition from the individual circumstances presented in each case." *In re J.P.*, 331 Ill. App. 3d 220, 234 (2002). "Generally, 'neglect' is defined as the ' "failure to exercise the care that the circumstances justly demand." ' " *Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000), quoting *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952)). Neglect also encompasses " ' "wilful as well as unintentional disregard of duty. *** It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." ' " *Arthur H.*, 212 Ill. 2d at 463 (quoting *N.B.*, 191 Ill. 2d at 346, quoting *Labrenz*, 411 Ill. at 624).

¶ 44    Similarly, "[n]eglect based on 'injurious environment' is a similarly amorphous concept not readily susceptible to definition." *J.P.*, 331 Ill. App. 3d at 234. Generally, "the term 'injurious environment' has been interpreted to include 'the breach of a parent's duty to ensure a "safe and nurturing shelter" for his or her children.' " *Arthur H.*, 212 Ill. 2d at 463 (quoting *N.B.*, 191 Ill. 2d at 346, quoting *In re M.K.*, 271 Ill. App. 3d 820, 826 (1995)).

¶ 45    In the instant case, respondent argues that the evidence did not support a finding of neglect. She contends that the food in her home was appropriate. She points out that while Austin-Antoine was critical of the amount of food in the home appropriate for Barion, Austin-Antoine also admitted that Barion was on table food and did not have a specific diet. Lacy testified that she saw Barion reject food. Neither Austin-Antoine nor Lacy testified that the home was unclean or that Barion showed signs of abuse or neglect. Respondent asserts that she displayed a willingness to address Barion's health problems and advocated for his care and treatment. Respondent questions the finding of a nonorganic failure to thrive by highlighting Barion's prescription for ranitidine to treat GERD. Respondent also points to the medical records that suggested other reasons for Barion's weight loss, such as teething, fever and lead poisoning. Respondent refers to Baine's testimony in support, but Baine testified only at the dispositional hearing and our review is limited to the adjudicatory hearing because respondent has only challenged the neglect finding.

¶ 46    Respondent argues that the facts of this case are similar to those present in *In re Gonzales*, 25 Ill. App. 3d 136 (1974). In that a case, a nonresident minor was visiting from out of state when she was taken into protective custody on allegations of neglect after she was hospitalized twice for diabetes acidosis in a short period of time. The reviewing court reversed the finding of neglect because the evidence failed to show that the cause of the

diabetes acidosis was misuse of insulin. A doctor testified that the misuse of insulin was the most common cause of diabetes acidosis, but admitted that there were other causes, especially in children. Further, the evidence had shown that a visiting nurse saw the minor properly administer the prescribed dose of insulin. "No evidence was produced from which one could reasonably infer that the causative factor of this medical condition was her environment. It is a non sequitur to find that because [the minor] had a severe diabetic condition her environment was injurious to her welfare. The mere fact of the severity of her condition does not give rise to an inference of parental neglect." *Gonzales*, 25 Ill. App. 3d at 144.

¶ 47 While the facts present in the instant case present a different situation than that present in *Gonzales*, the record established that respondent sought medical treatment repeatedly for her son because he would not eat and often threw up his food. Respondent initially brought Barion to St. Bernard Hospital because he kept vomiting. When this issue had not been resolved after multiple visits, respondent took Barion to different hospitals because she did not believe that Barion had been treated effectively and Barion continued to vomit after feeding. Respondent was proactive in seeking help for Barion. Lacy testified that respondent requested a referral for Barion because Stroger Hospital did not offer the services of a nutritionist. Lacy said that respondent wanted help for Barion because he was not gaining weight. Lacy referred respondent to La Rabida Hospital because it has a failure to thrive clinic. Lacy stated that respondent made an appointment for June 16, but the doctor was unable to see respondent at that time because she needed to transfer her medical card. By the time that process was complete, DCFS had already taken protective custody of Barion.

¶ 48 Respondent testified that Barion continued to have feeding issues in the hospital. Respondent also stated that she had custody of her daughter Deja and later gave birth to another child, and neither child had any problems while feeding. DCFS has not taken any action involving respondent's other children.

¶ 49 The testimony from both caseworkers did not support a finding of neglect. Lacy made 7 to 10 home visits and observed multiple feedings at different times of the day. She watched respondent feed Barion and testified that respondent was feeding him properly. Barion was in a high chair, in a quiet location, and respondent was focused on feeding him. The feedings would take approximately 45 minutes. Lacy also found the food to be appropriate for Barion. Lacy's testimony also supported respondent's concerns about Barion's eating. Lacy witnessed Barion reject food by take food from his mouth during feeding and she also saw Barion vomit after a feeding.

¶ 50 While Austin-Antoine stated that she did not think the food in respondent's home was sufficient for Barion, she testified that there were two boxes and two cans of appropriate graduate toddler food. She said respondent had a lot of food in the home and she also admitted that Barion was on table food with no specific diet. We note that Austin-Antoine visited respondent's home while Barion was at Stroger Hospital and she did not observe any feedings in the home. Both Austin-Antoine and Lacy found respondent's home to be clean and no marks were found on Barion.

¶ 51 The medical records present a conflicting basis for Barion's health issues. According to

the medical records, while Barion generally gained weight in the hospital, his weight fluctuated daily in the hospital with his weight going down slightly some days while other days his weight went up. In contrast, Barion generally lost weight while at home in respondent's care. The records diagnosed Barion with persistent nonorganic failure to thrive, but Barion was also prescribed medication for GERD, which suggests an organic basis for his failure to thrive. The progress notes also listed GERD as a possible contributing factor to Barion's inability to gain weight.

¶ 52 Respondent's attorney also highlighted portions of the medical records indicating that at times Barion ate only 30% to 50% of his food while in the hospital. However, the reports from Stroger Hospital noted that Barion ate 80% to 100% of his meals and was gaining 30 to 40 grams per day, on average, which was three to four times normal gains. There was no testimony from a medical professional to explain the discrepancies in the medical records and the diagnosis and treatment for Barion. The medical records do not establish that Barion's eating habits were consistently better at the hospital than at home.

¶ 53 The evidence presented at the adjudicatory hearing failed to establish that Barion was neglected beyond a preponderance of the evidence. Respondent, as a concerned parent, brought her son repeatedly to different hospitals seeking treatment for his inability to gain weight and feeding issues, including rejecting food and vomiting. Respondent acted on her concerns for Barion's health and continued to seek medical help when she did not receive sufficient explanations and answers about Barion. Lacy, the DCFS caseworker, observed respondent and Barion weekly and found respondent's home, care and feeding of Barion to be appropriate. Lacy did not offer any additional recommendations for respondent. Austin-Antoine also found the home to be clean and stocked with food. Though she noted that she would have wanted more food for a toddler, Austin-Antoine stated that graduate food was present in the home and that Barion was on table food with no specific diet.

¶ 54 Under the facts of this case, we find that the evidence presented rebutted the presumption of neglect based on a diagnosis of failure to thrive. The State's evidence was not sufficient to support a finding of neglect, and we conclude that the trial court's decision was against the manifest weight of the evidence. The State failed to prove that respondent breached her duty to provide a safe and nurturing shelter, such that Barion was neglected due to an injurious environment. See *Arthur H.*, 212 Ill. 2d at 463. The evidence did not show that it was more likely than not that Barion was neglected based on respondent's failure to exercise care or an unintentional disregard of her duty. See *Arthur H.*, 212 Ill. 2d at 463. The evidence set forth that respondent was proactive in seeking medical treatment for her son and her home was clean and stocked with food. The DCFS caseworker found respondent's feeding to be appropriate and no other concerns were raised. The adjudication of Barion as a neglected minor was not supported by the evidence presented.

¶ 55 Based on the foregoing reasons, the adjudicatory and disposition orders are reversed and the cause is remanded to the circuit court for the entry of an order dismissing the petition and discharging the minor from custody.

¶ 56 Reversed and remanded.