# Illinois Official Reports

## Appellate Court

---

### *In re Z.M.*, 2019 IL App (3d) 180424

---

| | |
|---|---|
| Appellate Court Caption | *In re* Z.M., a Minor (The People of the State of Illinois, Petitioner-Appellee, v. Donald W., Respondent-Appellant). |
| District & No. | Third District<br>Docket No. 3-18-0424 |
| Filed | June 21, 2019 |
| Decision Under Review | Appeal from the Circuit Court of Will County, No. 16-JA-42; the Hon. Paula A. Gomora, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Daniel Kallan, of Joliet, for appellant.<br><br>James W. Glasgow, State's Attorney, of Joliet (Patrick Delfino, David J. Robinson, and Thomas D. Arado, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.<br><br>Neil J. Adams, of Joliet, for minor-appellee. |
| Panel | JUSTICE CARTER delivered the judgment of the court, with opinion.<br>Justice Holdridge concurred in the judgment and opinion.<br>Justice McDade specially concurred, with opinion. |

**OPINION**

¶ 1     The respondent, Donald W., appeals from the circuit court's order terminating his parental rights as to his minor daughter, Z.M. On appeal, the respondent argues that (1) his right to due process was violated throughout the proceedings terminating his parental rights, (2) the trial court's finding that he was an unfit parent was against the manifest weight of the evidence, and (3) the trial court's finding that it was in Z.M.'s best interest to terminate his parental rights was against the manifest weight of the evidence. We affirm.

¶ 2                                        I. BACKGROUND

¶ 3     On March 22, 2016, the State filed a petition alleging that Z.M., who was almost two years old, was a neglected minor pursuant to section 2-3(1)(b) of the Juvenile Court Act of 1987 (705 ILCS 405/2-3(1)(b) (West 2016)) in that her environment was injurious to her welfare. On the same day, a shelter care hearing took place.

¶ 4                                     A. Shelter Care Hearing

¶ 5     At the shelter care hearing on March 22, 2016, Minnie Carr, a child protection specialist with the Department of Children and Family Services (DCFS), testified that on March 20, 2016, she investigated a report of a domestic dispute at the apartment where Z.M. resided in Rockdale, Illinois. A police officer told Carr that the apartment had "reeked of marijuana upon his entry" and that respondent had called the police because someone had pulled a knife on him. Z.M.'s mother was not at the apartment when Carr arrived. At the time of the incident, respondent had not yet established paternity regarding Z.M.

¶ 6     Carr testified that respondent told her that, when he awoke that morning, Z.M.'s mother and the cousin of Z.M.'s mother were in the living room smoking marijuana and he confronted them. According to respondent, he was going to remove Z.M. from the home, but a knife was pulled on him and he called police. Respondent indicated that he lived in the apartment and that he has had custody of Z.M. for the past 1½ years. Respondent later gave Carr an address for where he actually resides in Chicago, Illinois. Respondent could not participate in a safety plan for Z.M. because his paternity of Z.M. had not been established.

¶ 7     Carr spoke with Ariel, the cousin of Z.M.'s mother. Ariel indicated that she lived in the apartment but Z.M.'s mother did not live in the apartment. Another cousin of Z.M.'s mother—Yolanda—indicated that respondent did not live in the apartment but he was allowed to visit Z.M. whenever he wanted and he sometimes spent the night. Ariel and her children lived in the apartment, and Yolanda was in the process of moving into the apartment. Yolanda showed Carr a letter from Z.M.'s mother granting Yolanda permission to care for Z.M. until further notice. Carr also spoke with Z.M.'s mother, who indicated she was unsure if respondent was the father of Z.M.

¶ 8     The trial court found probable cause to believe that Z.M. was neglected due to an injurious environment. The factual basis for the trial court's finding was that a domestic dispute took place between Z.M.'s mother and respondent at 4 a.m. after respondent attempted to remove Z.M., Ariel pulled a knife on respondent, and the apartment reeked of marijuana. The trial court also noted that respondent had not established paternity. The trial court placed Z.M. in shelter care and reiterated that the basis of its finding was "the domestic dispute between the

- 2 -

parents, smoking of marijuana, and the natural father not establishing paternity of the minor." The trial court ordered that Z.M. be placed in the temporary custody of DCFS and admonished respondent and Z.M.'s mother to fully cooperate with DCFS to correct the conditions that required Z.M. to be removed or they would risk the termination of their parental rights.

¶ 9 The trial court also ordered respondent to submit to a paternity test. The results of the paternity test confirmed respondent's paternity of Z.M.

¶ 10                                B. Adjudication Hearing

¶ 11 On July 28, 2016, at the adjudication hearing, the parties stipulated that Z.M.'s environment was injurious to her welfare and that Z.M. was a neglected minor, with the factual basis being that there had been "a domestic disturbance where [her] mother's cousin had pulled a knife on [her] father and the minor was present" and cannabis was being used in the home where the minor was residing. The trial court accepted the stipulation of the parties and found that Z.M. was neglected in that her environment was injurious to her welfare. At that time, a service plan had not yet been established for respondent because he had missed two different appointments for an assessment interview. The trial court ordered respondent to complete the assessment interview with DCFS to determine what services he may need. The trial court admonished respondent as follows:

"So you are going to need to do that fairly quickly because in the next 30 days, we are going to have what is called a disposition, which will determine whether or not [Z.M.] should be made a ward of the Court.

And you will want to go through the service plan with your attorneys so that they can kind of, they can look at the service plan and decide also with you whether or not the services are those that would be beneficial to you so that you regain custody of your child.

* * *

This is your child. So you should be as involved as you can be at this point. That means visiting, engaging the services, making an effort, making progress with regard to the services.

If you are not getting the services in a timely fashion, you need to talk with your lawyers. That is what they are here for. They will in turn contact the caseworker and hound her to make sure that you get into the services that you need or let me know about it the next time we get together so I know that you are not getting the services that you need in order to get your child back.

Our intention is not to keep your child in foster care for any longer than we have to. And the 'have to' portion depends on you. Okay. So it is very, very important that you are compliant with the agency, that you do the services that are requested and demonstrate that you are able to safely and appropriately parent your child. That is all we are looking for."

¶ 12 The trial court indicated that respondent's interview would determine which services would be necessary so respondent should set that up as soon as possible.

¶ 13                                    C. Dispositional Hearing

¶ 14        On October 26, 2016, a dispositional hearing took place. The State entered into evidence the dispositional report, an addendum to the dispositional report, and the service plan dated October 13, 2016, with no objection from respondent. In the dispositional report and addendum, the caseworker indicated that respondent had been attempting to complete substance abuse treatment since March 2016, tested positive for marijuana several times since the beginning of the program, "recently" tested positive for both marijuana and cocaine (in September 2016), and was referred to an intensive outpatient program due to the positive drug screen and missed drug drops. The caseworker noted respondent's substance abuse would have to be continually monitored "due to extensive use since eighteen." Respondent was to complete services of substance abuse treatment, random drug testing, individual psychotherapy, and domestic violence classes. He was also required to maintain adequate housing and income, improve his parenting skills, and maintain an interest in the case. No other evidence was presented. Respondent's attorney noted that respondent was scheduled to complete parenting classes on October 29, 2016, and he was "actively involved" in substance abuse classes, had stable housing in Chicago, Illinois (although he admittedly still needed to provide proof of his housing to the caseworker), had "income from a legal settlement that occurred sometime ago," and was working (although he admittedly still needed to provide his pay stubs to the caseworker).

¶ 15        The trial court found that it was in the best interest of Z.M. to make her a ward of the court and found both parents unfit to care for, protect, train, or discipline Z.M., with the factual basis being that "both parents have yet to complete services outlined in their service plan in order for the minor to be returned home safely." The trial court ordered that Z.M. be placed in the custody and guardianship of DCFS, granted visitation at the discretion of DCFS, and set the permanency goal for Z.M. as returning home within 12 months. The trial court did not admonish respondent that he had the right to appeal.


¶ 16                        D. Proceedings Following the Dispositional Hearing
¶ 17                                    1. Permanency Review Hearings
¶ 18        On April 26, 2017, at a permanency review hearing, respondent's attorney indicated that respondent had completed substance abuse treatment (on November 15, 2016), was in individual counseling, and had supervised visits with Z.M. multiple times per week. The guardian *ad litem* reported that, while respondent had completed his substance abuse program, he "tested dirty a week before he was discharged" and had missed a random drug drop in December 2016. The trial court ordered that drug screens be performed more frequently to determine "with certainty that there is progress." The trial court found respondent had made substantial progress toward the goal of returning Z.M. home and set the permanency goal as returning home within 12 months.

¶ 19        On October 3, 2017, at a permanency review hearing, respondent's attorney acknowledged that respondent needed to "work on his drug drops" but indicated that respondent had been visiting Z.M. and had completed individual counseling. Reports from the guardian *ad litem* and the caseworker indicated that respondent had completed substance abuse treatment on November 15, 2016, failed to appear for a drug screen on June 21, 2017, had a clean drug screen on July 12, 2017, failed to complete a drug screen on August 4, 2017 (due to respondent producing too little urine and then leaving the building even though he had been asked to

- 4 -

remain in the building to try again), and failed to appear on September 15, 2017. The result of the drug screen performed on September 27, 2017, was still pending. The caseworker reported that since the last court date respondent had completed individual therapy, was currently addressing domestic violence issues in therapy, and had two-hour supervised visits with Z.M. once per week. Respondent was allowed to visit Z.M. twice per week but failed to indicate another day that he was available to do so each week. On September 20, 2017, respondent had submitted proof of employment at a temporary staffing agency and three check stubs, each for one day of employment. The trial judge stated, "I am going to order that the agency take the case to legal screening, whatever the results are," and changed the permanency goal to "return home pending status."

¶ 20 On November 6, 2017, at a status hearing, the caseworker indicated that the legal screening had not yet taken place. The respondent's attorney indicated that she was concerned that respondent had not been receiving any drug testing. The caseworker explained that she had not been requesting drug drops because respondent had tested positive for marijuana at the end of September and was still "dropping dirty" after completing treatment. The trial court indicated that the permanency goal was still returning home "so services should continue."

¶ 21 On November 17, 2017, the caseworker confirmed that the matter had passed legal screening. The trial court continued the case until January 3, 2018, for a status on the filing of the termination petition. On January 3, 2018, the assistant state's attorney stated:

"My first nine-month period is from July of 2016 to April of 2017. Dad was satisfactory during that period. I don't have a second nine-month period. My second nine-month period doesn't end until January 28th.

So I can't file anything until after January 28th.

Now, during the second nine-month period, there is no progress; but during the first nine-month period, I've got progress."

¶ 22 On February 21, 2018, at a status hearing, the assistant state's attorney confirmed that she had not filed a termination petition because during the first nine-month period respondent had been rated as "satisfactory" and she had been waiting for the completion of the second nine-month period.[1] The assistant state's attorney indicated that she wanted to review the caseworker's report to "determine whether or not there ha[d] been any changes or if [she could] file a petition to terminate." The caseworker reported that respondent had tested positive for marijuana in September 2017 and January 2018. The caseworker indicated that she offered to refer respondent to substance abuse treatment in his area but respondent had indicated that he had a provider and he would contact the caseworker with the information of that provider so that she could provide a referral. Respondent confirmed that he was waiting on "Gateway to call [him] back." The following colloquy ensued:

"[RESPONDENT'S ATTORNEY]: Isn't the agency supposed to be making referrals instead of having dad do it?

THE COURT: Yes.

[ASSISTANT STATE'S ATTORNEY]: I believe she indicated that she was having him call her with places in his area so that she can refer him.

_____

[1]As noted above, Z.M. was adjudicated neglected on July 28, 2016, and at a subsequent permanency review hearing on April 26, 2017, the trial court found respondent had made "substantial progress."

THE COURT: Can't you reach out to DCFS in Chicago to see what services are available near him so he doesn't have to hunt them down. I mean I understand if there are services in his area, but it may be beneficial to have some assistance.

[CASEWORKER]: Okay. I will try DCFS in his area. There are services in his area that he was aware of. I gave him those.

THE COURT: He lives in Chicago.

[CASEWORKER]: I gave him those in his area when the case first started, like five or six places, but he wanted to do Stepping Stones which he attempted like three or four times.

THE COURT: Okay. We need a PRH [(permanency review hearing)].

* * *

THE COURT: Is it going back to legal screening?

[ASSISTANT STATE'S ATTORNEY]: It doesn't need to go back to legal screening. I can make that determination based on the information that [the caseworker] did provide me today.

THE COURT: Why don't we have a status?

[ASSISTANT STATE'S ATTORNEY]: Judge, it passed legal screening. It was my determination [that] I didn't have enough that first nine-month period. I was waiting for the second.

THE COURT: Okay. Why don't we have a status on the filing of the petition. I want to make sure that we don't lose the PRH [permanency review hearing] date."

¶ 23    The case was set for a status on the filing of the petition to terminate parental rights on March 26, 2018, and a permanency review hearing on April 18, 2018.

¶ 24    On March 2, 2018, the State filed a petition to terminate respondent's parental rights, alleging that respondent (1) failed to maintain a reasonable degree of interest, concern, and responsibility as to Z.M.'s welfare under section 1(D)(b) of the Adoption Act (750 ILCS 50/1(D)(b) (West 2016)); (2) failed to make reasonable efforts to correct the conditions that were the basis for the removal of Z.M. (from April 28, 2017, to January 28, 2018), pursuant to section 1(D)(m)(i) of the Adoption Act (*id.* § 1(D)(m)(i)); and (3) failed to make reasonable progress toward the return of Z.M. during any nine-month period after the end of the initial nine months following the adjudication of neglect (from April 28, 2017, to January 28, 2018), pursuant to section 1(D)(m)(ii) of the Adoption Act (*id.* § 1(D)(m)(ii)).

¶ 25    On April 18, 2018, a permanency review hearing took place. The most recent service plan, dated March 20, 2018, indicated that respondent had provided proof of employment from October 2017 through January 10, 2018, but provided no proof of employment thereafter. Respondent did not make himself available for home visits, did not provided a new lease or rent receipts, and did not communicate with the caseworker as requested. Respondent's last positive urine screen was on January 24, 2018, and he was assessed by his new substance abuse treatment provider (Healthcare Alternative Systems (HAS)) on March 5, 2018. Respondent was recommended for intensive outpatient treatment. He needed to sign consents for the caseworker to receive reports from HAS. Without objection from respondent, the trial court found respondent had failed to make reasonable efforts or reasonable progress and changed the permanency goal to substitute care pending the court's determination of the termination petition.

¶ 26   On May 18, 2018, Z.M.'s mother surrendered her parental rights. The case was continued for a trial on the termination petition as to respondent.

¶ 27                              2. Unfitness Hearing

¶ 28   On July 12, 2018, at the unfitness hearing, the caseworker testified that Z.M. was four years old, and Z.M.'s mother had surrendered her parental rights to Z.M. the previous month. Two service plans covering the six-month period of February to August 28, 2017, and the six-month period of September 2017 to March 20, 2018, were entered into evidence. The services that respondent was expected to perform, as outlined in the service plans, were to provide proof of and maintain adequate housing; allow monthly home visits; provide proof of working utilities and landlord information; provide monthly check stubs to show proof of employment; keep DCFS informed of any changes in address, phone number, employment, or household composition; sign releases and consents; complete a domestic violence assessment and any recommended treatment; participate in individual therapy; submit to random urine screens; complete a substance abuse assessment and any recommended treatment (including parenting classes); attend all court dates; attend visits with Z.M. as scheduled; and call the caseworker at least once a month to inform her of progress or problems.

¶ 29   The service plans and the testimony of the caseworker indicated that respondent had initially attempted substance abuse counseling shortly after Z.M. had been removed in March 2016 but he had trouble maintaining sobriety. He tested positive for both marijuana and cocaine on August 30, 2016, and was recommended for intensive outpatient treatment, which he completed in November 2016. The caseworker had attempted to allow unsupervised visits between respondent and Z.M., but respondent did not perform the requested drug drop for her to do so in December 2016.

¶ 30   During the six-month time period of February through August 2017, respondent was a "no show" from some requested drug screens (which are considered to be positive for drugs). Respondent attended individual counseling and domestic violence treatment from March to June 2017 and was successfully discharged. On August 4, 2017, respondent missed a drug drop after he left the building following a visit with Z.M., even though he had been requested to remain in the building to redo a drug screen because he had produced too little urine in his first attempt. As of August 31, 2017, respondent's visits with Z.M. had become "sporadic," with respondent visiting three out of the eight available times per month. Respondent could have visited Z.M. twice per week, but he failed to relay to the caseworker his availability for a second day per week.

¶ 31   During the six-month time period of September 2017 to March 2018, the issues respondent still needed to address were additional substance abuse treatment and consistent visitations with Z.M. During that time, respondent's visits with Z.M. remained inconsistent, with respondent still only averaging three visits per month. Respondent missed a drug drop on September 5, 2017, and tested positive for marijuana on September 27, 2017. The caseworker spoke with respondent on October 4, 2017, and again on January 24, 2017, about which substance abuse treatment provider he had chosen so she could provide a referral.

¶ 32   On January 24, 2017, respondent was asked to provide a urine screen after his visit with Z.M., but respondent claimed not to have identification. After the caseworker verified respondent's identification, respondent submitted a clear urine specimen that did not have a "temperature" after having refused to leave his coat in another room and turning away from

- 7 -

the person observing the drop. Respondent was instructed to give a second urine sample, which had color and "temperature" and which was positive for marijuana. Respondent returned to substance abuse treatment in March 2018, in Chicago. The caseworker did not have verification that respondent had completed the program. The caseworker also did not receive another lease from respondent after his lease expired in October of 2017.

¶ 33     Respondent testified that, during the pendency of this case, he had worked at a Pizza Hut and he currently worked at a different fast food restaurant. He also testified that he had stable housing in Chicago. Respondent testified that he was referred for substance abuse treatment in October 2017 and January 2018, but he did not start treatment until March 2018 due to a problem with his insurance. Respondent testified he had canceled or rescheduled some visits because he "didn't have car fare" to travel to Joliet from Chicago. Respondent testified that, during his visits with Z.M., they played with toys and Barbie dolls and read books. Respondent brought fast food to the visits and fed Z.M. Respondent also attended most court dates regarding Z.M. and contacted his attorney when he was unable to do so.

¶ 34     After the State had presented its evidence and prior to the respondent testifying, the respondent's attorney had motioned the trial court for a directed finding. At that time, the trial court found that the State did not present sufficient evidence that respondent had failed to make reasonable efforts to correct the conditions that were the basis of Z.M.'s removal. After respondent testified and the attorneys gave closing arguments, the trial court found, by clear and convincing evidence, that respondent was unfit in that he failed to maintain a reasonable degree of interest, concern, or responsibility as to Z.M.'s welfare and failed to make reasonable progress toward the return of Z.M. after Z.M. was adjudicated neglected, during the nine-month period of April 29, 2017, to January 28, 2018. The trial court noted "the heart of the case [was] substance abuse treatment as well as domestic violence" and respondent continued to test positive for drugs, failed to show for requested drug screens, had difficulty obtaining and maintaining sobriety, failed to complete intensive outpatient treatment (after being provided with treatment facilities in his area), and only visited Z.M. once per week rather than twice per week, averaging only three visits per month. The trial court also noted that respondent had tested positive for marijuana on September 27, 2017, and January 24, 2018, and had been recommended for intensive outpatient treatment, which he did not begin until after the applicable nine-month period had ended.

¶ 35                                    3. Best Interest Hearing

¶ 36     At the best interest hearing directly following the unfitness hearing, the caseworker testified that Z.M. had been placed in relative foster care with her maternal great aunt and uncle, who are in their late forties and live in a three-bedroom home. The caseworker visited the home at least once per month and had not observed any safety concerns. Z.M. had her own bedroom, furniture, and toys. Z.M. called her aunt "mama" and her uncle "uncle." The couple treated Z.M. in a "loving and caring way." The caseworker testified that Z.M. is closely bonded with her foster mother. Z.M.'s foster parents viewed Z.M. as their daughter and viewed themselves as her main caregivers. Interactions between Z.M. and her foster parents were appropriate, and Z.M. appeared to be a happy child. Z.M. was doing well in preschool and had made friends. Z.M.'s foster parents take Z.M. on various outings, do various activities with Z.M., and keep Z.M. involved with her maternal extended family. Z.M.'s foster parents were able to provide for Z.M.'s financial, medical, and emotional needs and were willing to adopt

Z.M. The caseworker testified that she believed it was in Z.M.'s best interest if Z.M.'s foster parents adopted Z.M. Z.M. appeared to love her foster parents, and they love her.

¶ 37     The caseworker also testified that Z.M. was bonded to and loved respondent. Z.M. called respondent "dad," and their visits together were appropriate. During visits, respondent and Z.M. played. Respondent talked with Z.M. and remained engaged with Z.M. throughout the entire visit. He would also bring Z.M. food each visit and brought gifts at times as well.

¶ 38     Respondent testified that he last visited with Z.M. the day prior to the court hearing, and Z.M. was "very happy" to see him. During the visit they played with toys and ate fast food. During their other visits, respondent and Z.M. would also play and eat together. Respondent testified that he loved Z.M. and that he was willing to continue to engage in services. He also testified that he was able to financially support Z.M. through his employment and a monthly settlement payment that he receives for $2100.

¶ 39     In ruling, the trial judge stated:

"I could say unequivocally, I understand that [respondent] loves his daughter.

It's also this Court's responsibility to make sure that the minor is provided permanency in their [*sic*] life and are able to reside in a home where she's going to be taken care of.

During the time period that was alleged by the State, the services that needed to be completed mainly again, substance abuse treatment, was not completed. Again, the matter came in in 2016."

¶ 40     The trial court found, by a preponderance of the evidence, that it was in the best interest of Z.M. that respondent's parental rights be terminated. Respondent appealed.

¶ 41                                    II. ANALYSIS

¶ 42     On appeal, respondent argues that the trial court's decision to terminate his parental rights should be reversed because (1) his right to due process was violated during the termination proceedings by the trial court failing to admonish him of his right to appeal following the entry of the dispositional order entered on October 26, 2016, the State not having an objective reason to recommend substance abuse treatment as part of respondent's service plan, the trial court ordering DCFS to take the case to legal screening *sua sponte*, DCFS failing to refer respondent to additional substance abuse treatment in September 2017, and his parental rights having been terminated for no reason other than a recreational use of cannabis; (2) the trial court's findings that respondent was unfit pursuant to section 1(D)(b) and section 1(D)(m)(ii) of the Adoption Act were against the manifest weight of the evidence; and (3) the trial court erred in finding that it was in Z.M.'s best interest to terminate respondent's parental rights.

¶ 43                                    A. Due Process

¶ 44     Pursuant to the fourteenth amendment of the United States Constitution no person shall be deprived of life, liberty, or property without due process of law. U.S. Const., amend. XIV, § 1. The due process clause provides " 'heightened protection against government interference with certain fundamental rights and liberty interests.' " *In re M.H.*, 196 Ill. 2d 356, 362 (2001) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)). These liberty interests that are protected by the due process clause include a parent's fundamental right in the care, custody, and control of his or her children. *Id.* at 362-63. Due process in the context of interference with

parental rights is achieved by compliance with the provisions of the Juvenile Court Act of 1987 and fundamental fairness. *In re D.T.*, 2017 IL App (3d) 170120, ¶ 23. Claims of due process violations are questions of law that we review *de novo*. *In re A.M.*, 402 Ill. App. 3d 720, 723 (2010); *In re D.W.*, 214 Ill. 2d 289, 309 (2005).

¶ 45 In *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), the United States Supreme Court identified three factors to be considered when determining what due process safeguards require in proceedings that implicate fundamental liberty interests: (1) the private interest implicated by the official action; (2) the risk of an erroneous deprivation of that interest through the proceedings used, and the probable value, if any, of additional or substitute safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards would entail. *In re Andrea F.*, 208 Ill. 2d 148, 165 (2003) (citing *Mathews*, 424 U.S. at 335). The *Mathews* factors have been applied to cases involving the termination of parental rights. *Id.*

¶ 46                                        1. Right to Appeal the Dispositional Order

¶ 47 First on appeal, respondent argues the trial court erred by failing to admonish him of his right to appeal following the entry of the dispositional order entered on October 26, 2016, and requests that this court vacate all proceedings subsequent to the entry of the dispositional order. Respondent did not raise this issue in the trial court and requests that we review the issue for plain error. See *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005) (the plain error doctrine allows this court to consider forfeited issues when a clear or obvious error occurred and the evidence is closely balanced or the error affects substantial rights). Respondent notes that he had stipulated that Z.M. was neglected and contends that "[h]is stipulation to neglect was in essence a guilty plea." Analogizing the stipulation in this case to a guilty plea in a criminal case, respondent argues he would have had to have filed a motion to withdraw his stipulation that Z.M. was neglected in order to appeal the dispositional order entered in this case and, thus, should have received admonishments "similar to the requirements of Rule 605(b)." See Ill. S. Ct. R. 605(b) (eff. Oct. 1, 2001) (providing, *inter alia*, that when a judgment is entered upon a plea of guilty, at the time of imposing sentence, the defendant should be admonished that prior to taking an appeal the defendant must file a written motion asking the trial court to reconsider the sentence or vacate the judgment and for leave to withdraw the plea of guilty). Respondent contends that, as a result of the trial court's error of failing to admonish him of his right to appeal the dispositional order, "all proceedings subsequent to October 26, 2016, including the termination of [his] parental rights should be vacated and the case remanded for a redo."

¶ 48 In response, the State concedes the trial court's error in failing to admonish respondent of his right to appeal the dispositional order entered on October 26, 2016. The State, however, argues that respondent's argument is an attack on the dispositional order entered on October 26, 2016, over which this court lacks jurisdiction because respondent failed to file a timely notice of appeal or late notice of appeal pursuant to Illinois Supreme Court Rule 303 (eff. July 1, 2017). The State, therefore, contends that this court should dismiss respondent's appeal "relative to the arguments regarding the original dispositional order."

¶ 49 In reply, respondent reiterates that he is not contesting the entry of the dispositional order or the neglect finding but that he is "appealing the trial court's failure to advise him of his appellate right which denied him due process."

¶ 50    Here, as the State concedes, the trial court erred by failing to admonish respondent of his right to appeal following the entry of the dispositional order. See 705 ILCS 405/1-5(3) (West 2016) (providing that, at the dispositional hearing, "the court shall inform the parties of their right to appeal therefrom as well as from any other final judgment of the court"). We agree with the State that we lack jurisdiction to review the adjudication and dispositional orders entered in this case because respondent did not file a timely notice of appeal or motion to file a late notice of appeal in regard to the adjudication or dispositional orders. See *In re Zariyah A.*, 2017 IL App (1st) 170971, ¶ 65 (citing *In re Barion S.*, 2012 IL App (1st) 113026, ¶ 36 (the dispositional order is a final and appealable order)); Ill. S. Ct. R. 303 (eff. July 1, 2017) (a notice of appeal in a civil case must be filed within 30 days after entry of the final order, unless the appellant files a motion to file a late notice of appeal within 30 days after the expiration of time to file the notice of appeal showing a reasonable excuse for failing to file a timely notice of appeal). Contrary to the State's assertion, respondent has not raised any issue pertaining to the validity of the dispositional order entered on October 26, 2016. Rather, respondent argues that "all proceedings subsequent to October 26, 2016, including the termination of [his] parental rights should be vacated and the case remanded for a redo." This appeal, which is from the final order terminating respondent's parental rights, was timely filed. See Ill. S. Ct. R. 303 (eff. July 1, 2017). We, therefore, have jurisdiction to review respondent's arguments on appeal.

¶ 51    In applying the *Mathews* factors in this case, we do not find that due process requires this court to vacate the proceedings subsequent to the dispositional hearing. Here, the private interest at stake is respondent's interest in the control, custody, and care of his child, Z.M., which is a fundamental right that will not be terminated lightly. See *M.H.*, 196 Ill. 2d at 362-63. The trial court's procedural error of failing to admonish respondent of his right to appeal following the entry of the dispositional order increased the risk of an erroneous deprivation of respondent's rights, which implicates the perceptions of judicial fairness and the integrity of the judicial proceedings. See *A.M.*, 402 Ill. App. 3d at 725. However, there would be little value in vacating the proceedings subsequent to the dispositional hearing as a substitute safeguard because there is no indication that respondent would have appealed from the dispositional order or that there was any issue of merit that could have been raised in such an appeal. See *In re S.P.*, 2019 IL App (3d) 180476, ¶ 48. Additionally, in considering the governmental interest involved, vacating the 18 months of proceedings subsequent to the entry of the dispositional hearing in this case would be unduly burdensome upon the State's interests of preserving and promoting Z.M.'s welfare and reducing the cost and burden of the termination proceedings. See *M.H.*, 196 Ill. 2d at 367 (the State's interests in parental termination proceedings are an interest in preserving and promoting the welfare of the child and an administrative interest in reducing the cost and burden of such proceedings); *A.M.*, 402 Ill. App. 3d at 725 (delays in termination of parental rights proceedings impose a serious cost on the function of the government and intangible costs to the lives of the children involved). Therefore, our application of the *Mathews* factors indicates that due process does not require this court to vacate the proceedings following the entry of the dispositional order entered in this case.

¶ 52                              2. Requiring Substance Abuse Treatment

¶ 53        In so far as respondent is arguing that "due process require[d] the State to have an objective reason to recommend substance abuse treatment," we find the issue to be without merit. "Any tasks the court requires of the parents, guardian, or legal custodian or child prior to returning the child home, must be reasonably related to remedying a condition or conditions that gave rise to or which could give rise to any finding of child abuse or neglect." 705 ILCS 405/2-28(2) (West 2016).

¶ 54        In this case, requiring respondent to complete substance abuse treatment as part of his service plan was reasonably related to remedying the condition that gave rise to Z.M. being removed from the home on March 20, 2016. At the adjudication hearing on July 28, 2016, respondent stipulated that Z.M. was neglected, with the factual basis being that a knife had been pulled on respondent and cannabis was being used in the home where Z.M. resided. Although respondent claimed that Z.M.'s mother and her cousin were responsible for the marijuana smell in the home, the fact remains that Z.M. was removed, in part, because of drug use in the home. At the time of the adjudication hearing on July 28, 2016, there was no service plan for respondent in place because respondent had failed to attend two scheduled assessment interviews with DCFS, but he had begun substance abuse treatment shortly after Z.M. was removed in March 2016, and respondent had tested positive for marijuana "several times in the beginning of [that] program." Additionally, on August 30, 2016, respondent submitted a urine sample that was positive for both marijuana and cocaine. Based on the record before us, there is no merit to respondent's assertion that there was not an objective reason for the State to recommend substance abuse treatment.

¶ 55                                    3. Legal Screening

¶ 56        Respondent contends the manner in which this case was referred to legal screening violated his right to due process. Specifically, respondent argues that the trial court improperly "assumed a prosecutorial function" by *sua sponte* ordering DCFS to send the case to "legal screening." The State argues that the trial court had ordered DCFS to take the case to legal screening "whatever the results are," which was not a predetermination by the trial court as to whether respondent's parental rights should have been terminated.

¶ 57        In this case, at the time of the permanency review hearing at which the trial court ordered DCFS to send the case to legal screening, it had been 15 months since Z.M. had been adjudicated neglected. Since the adjudication of neglect on July 28, 2016, respondent completed outpatient substance abuse treatment on November 15, 2016, but continuously missed drug drops for the next year. At the permanency hearing on October 3, 2017, the trial court ordered DCFS to take the case to legal screening and changed the permanency goal to return home pending a status hearing, as the trial court was authorized to do so pursuant to section 2-28(2)(B-1) of the Juvenile Court Act of 1987. See *id.* § 2-28(2)(B-1) (at the permanency review hearing, the trial court shall set one of the listed permanency goals, which includes the goal of the minor being "in short-term care with a continued goal to return home pending a status hearing"). Pursuant to the Illinois Administrative Code, "[w]hen one of the grounds for termination of parental rights appears to exist and return home as a permanency goal for the child is no longer appropriate, [DCFS] shall conduct an internal legal screening." 89 Ill. Adm. Code 309.80(a) (2018). We find no error committed by the trial court in ordering DCFS to take the case to legal screening where grounds for termination of respondent's

parental rights appeared to exist and the trial court had changed the permanency goal to return home pending a status hearing. See *id.*

¶ 58    Moreover, respondent's due process rights were not violated by the trial court ordering the case to go to legal screening. The trial court made no determination as to whether the State should file a termination of parental rights petition. The purpose of DCFS conducting an internal legal screening is to determine (1) whether there is sufficient evidence to support a finding that there are grounds for termination of parental rights, (2) whether it is in the best interest of the child to seek termination of parental rights, and (3) steps that need to be completed to permit the filing of a petition to terminate parental rights. 89 Ill. Adm. Code 309.80(b) (2018). Here, there was no risk of an erroneous deprivation of respondent's parental rights solely because the trial court ordered that the case be submitted for a legal screening where the permanency goal remained returning home and DCFS was still obligated to provide reunification services. See 705 ILCS 405/2-28(2) (West 2016) (where the court has selected a permanency goal other than returning home for a child age 15 or under, DCFS shall not provide further reunification services). Thus, we find no violation of respondent's due process rights as the result of the manner in which this case was referred to legal screening.

¶ 59    4. Failure to Refer Respondent to Additional Substance Abuse Treatment

¶ 60    Respondent argues that he should have been referred to additional substance abuse treatment in September 2017. He contends that DCFS requiring him to find a treatment provider in his area was a "delaying tactic" that was used while "the State waited for the clock to run out on the second nine month period to file a petition to terminate parental rights."

¶ 61    Here, during the relevant nine-month period respondent missed a drug drop on September 15, 2017, and tested positive for marijuana on September 27, 2017. At the permanency review hearing on October 3, 2017, the trial court ordered that the case be submitted to legal screening and changed the permanency goal to returning home pending a status hearing (*id.* § 2-28(2)(B-1)). Respondent acknowledges that on October 4, 2017, the day after the permanency review hearing, he and the caseworker met "to discuss substance abuse providers in his area." The caseworker had previously given respondent information for numerous service providers in respondent's area and attempted to coordinate further services for respondent when they met on October 4, 2017. Respondent hindered those efforts by indicating that he would choose the treatment provider but failing to relay the provider's information to the caseworker so she could provide a referral. Respondent failed to select a treatment provider and again tested positive for marijuana in January 2018. Based on this record, there is no merit to respondent's argument that DCFS had "given up" on him or that DCFS did not refer him to relapse counseling or additional treatment in an attempt to "run out the clock" on his parental rights.

¶ 62    5. Recreational Use of Cannabis

¶ 63    Respondent also argues that his right to due process was violated because his parental rights were terminated over a "recreational" use of cannabis, which he contends was conduct that was "less serious than a speeding ticket." We interpret respondent's arguments to be that due process required the State and the trial court to view his marijuana use as a nonfactor in this case.

¶ 64    In examining the *Mathews* factors, we again note that respondent has a private interest in the control, custody, and care of his child. See *M.H.*, 196 Ill. 2d at 362. The trial court

- 13 -

considering respondent's marijuana use did not create a risk of an erroneous deprivation of respondent's parental rights in this case where there is no indication that the trial court failed to comply with the provisions of the Juvenile Court Act of 1987 in doing so. See *D.T.*, 2017 IL App (3d) 170120, ¶ 23 (due process in the context of interference with parental rights is achieved by compliance with the provisions of the Juvenile Court Act of 1987 and fundamental fairness). Additionally, ignoring respondent's marijuana use in this case would have been of little value when balanced against the government's interests of preserving and promoting Z.M.'s welfare and reducing the cost and burden of the termination proceedings. See *M.H.*, 196 Ill. 2d at 367. Regardless of whether respondent's suspected substance abuse pertained to marijuana, alcohol, prescription medication, or any other substance, whether legal or illegal, respondent's right to due process was not violated where Z.M. was not returned home partly because the issue of respondent's suspected substance abuse remained unresolved as the result of respondent continuing to miss requested drug screens, testing positive for marijuana, and failing to comply with securing an additional treatment provider. See *In re C.N.*, 196 Ill. 2d 181, 216-17 (2001) (the benchmark for measuring a parent's progress toward the return of the child encompasses the parent's compliance with the service plans and the court's directives in light of the conditions that gave rise to the removal of the child and in light of other conditions that later become known that would prevent the court from returning custody of the child to the parent). In applying the *Mathews* factors, we do not find that due process required the trial court or the State to ignore respondent's marijuana use in this case. See *Andrea F.*, 208 Ill. 2d at 165 (citing *Mathews*, 424 U.S. at 335).

¶ 65                                                      B. Unfitness

¶ 66        On appeal, respondent also argues that the trial court's findings were against the manifest weight of the evidence where the trial court found that respondent was unfit for failing to maintain a reasonable degree of interest, concern, and responsibility as to Z.M.'s welfare pursuant to section 1(D)(b) of the Adoption Act and for failing to make reasonable progress toward the return of Z.M. during any nine-month period after the end of the initial nine months following the adjudication of neglect pursuant to section 1(D)(m)(ii) of the Adoption Act, with the nine-month period being April 28, 2017, to January 28, 2018. The State and the guardian *ad litem* for Z.M. both argue that the trial court's findings were not against the manifest weight of the evidence.

¶ 67        In reviewing a trial court's finding of parental unfitness, the trial court's decision will not be reversed on appeal unless the finding was against the manifest weight of the evidence. *C.N.*, 196 Ill. 2d at 208. Only if the record shows that it is clearly apparent that the trial court should have reached the opposite conclusion should the trial court's decision be deemed to be against the manifest weight of the evidence. *Id.*

¶ 68        In this case, the trial court found respondent was unfit pursuant to section 1(D)(m)(ii) of the Adoption Act because he failed to make reasonable progress during the nine-month period of April 28, 2017, to January 28, 2018. See 750 ILCS 50/1(D)(m)(ii) (West 2016) (a ground of parental unfitness is the failure "to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of" neglect). Our supreme court has interpreted section 1(D)(m)(ii) as requiring a parent to make demonstrable movement toward the goal of reunification. *C.N.*, 196 Ill. 2d at 211. The benchmark for measuring a parent's reasonable progress includes compliance with service plans and court directives in

- 14 -

light of the condition that gave rise to the removal of the child and other conditions that later become known that would prevent the court from returning custody of the child to the parent. *Id.* at 216-17. Reasonable progress occurs when the trial court can conclude that the progress being made by a parent to comply with the directives given for the return of the minor is sufficiently demonstrable and of such quality that the court would be able to order the child returned to the parent's custody in the near future. *In re J.H.*, 2014 IL App (3d) 140185, ¶ 22. In determining whether a parent has made reasonable progress toward the return home of the minor, the trial court is to consider evidence occurring only during the relevant nine-month period. *In re J.L.*, 236 Ill. 2d 329, 341 (2010).

¶ 69     During the relevant nine-month period in this case, respondent failed to comply with requirements of the service plans and the court's directives. Respondent failed to complete requested drug screens on June 21, August 4, and September 5, 2017, and he tested positive for marijuana on September 15, 2017, and January 24, 2018. In the beginning of the case, the caseworker provided respondent a list of substance abuse providers near where respondent resided in Chicago. In October 2017 and January 2018, the caseworker and respondent discussed respondent's needing to secure additional substance abuse treatment. Respondent indicated that he would contact the caseworker with the information of his preferred treatment provider so that she could give a referral for treatment, but respondent failed to do so. Respondent did not start treatment until March 2018, which was beyond the relevant nine-month period. Additionally, during the nine-month period, respondent's visits with Z.M. had become sporadic. While respondent testified he canceled or rescheduled some weekly visits because he did not have "car fare" to travel to Joliet, there is no indication that he relayed this issue to the caseworker or to the trial court at any point during the relevant nine-month period. Rather, the evidence is clear that while respondent could have visited Z.M. twice per week, he only attended visits approximately once per week and averaged only three visits per month.

¶ 70     Therefore, based on our review of the evidence presented at the unfitness hearing, the trial court's finding that respondent failed to make reasonable progress during the relevant nine-month period was not against the manifest weight of the evidence. Because only one ground for a finding of unfitness is necessary to uphold the trial court's finding of parental unfitness, we need not review the other basis for the court's unfitness finding. See *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005) (a parent's rights may be terminated if even a single alleged ground for unfitness is supported by the evidence).

¶ 71                                      C. Best Interest

¶ 72     Lastly, respondent argues that the trial court's finding that it was in the best interest of Z.M. to terminate his parental rights was against the manifest weight of the evidence. The State and the guardian *ad litem* argue the trial court did not err in finding that it was in Z.M.'s best interest to terminate respondent's parental rights.

¶ 73     At the best interest stage, the State must prove by a preponderance of the evidence that it is in the child's best interest to terminate parental rights. *In re D.T.*, 212 Ill. 2d 347, 365-66 (2004). In making its determination, a court must consider several factors "in the context of the child's age and developmental needs," including (1) the child's physical safety and welfare, including food, shelter, health, and clothing; (2) the development of the child's identity; (3) the child's background and ties, including familial, cultural, and religious background; (4) the child's sense of attachment, including love, security, familiarity, and continuity of relationships

with parent figures; (5) the child's wishes and long-term goals; (6) community ties, including church, school, and friends; (7) the child's need for permanence; (8) the uniqueness of every family and every child; (9) the risks related to substitute care; and (10) the preferences of the persons available to care for the child. 705 ILCS 405/1-3(4.05) (West 2016). At this stage of the proceedings, "the parent's interest in maintaining the parent-child relationship must yield to the child's interest in a stable, loving home life." *D.T.*, 212 Ill. 2d at 364. Once a trial court has found that a parent is unfit, all considerations yield to the best interest of the minor and the minor's interest in a stable, loving, and safe home environment. *Id.* A trial court's best interest determination will only be disturbed if it is against the manifest weight of the evidence. *In re Austin W.*, 214 Ill. 2d 31, 51-52 (2005).

¶ 74 Here, the evidence shows that Z.M. lived with her great aunt and uncle in a three-bedroom home, with no safety issues. Z.M. appeared to be happy, and her aunt and uncle were able and willing to meet her financial, medical, and emotional needs. She was bonded with her foster mother, and she participated in activities with her extended family members. While there was evidence that Z.M. was bonded with respondent, the evidence also indicated that Z.M. was in need of permanency. Z.M. had been living with her aunt and uncle since she was removed from the care of her mother and respondent in March 2016 and her foster parents were willing to adopt her. Based on the evidence presented, we conclude that the trial court's determination that it was in Z.M.'s best interest to terminate respondent's parental rights was not against the manifest weight of the evidence.

¶ 75                             III. CONCLUSION
¶ 76 The judgment of the circuit court of Will County is affirmed.

¶ 77 Affirmed.

¶ 78 JUSTICE McDADE, specially concurring:

¶ 79                             Due Process Violation
¶ 80 Relying on what I believe to be the fundamental justice and fairness that the due process clause protects (*Lyon v. Department of Children & Family Services*, 209 Ill. 2d 264, 272 (2004) ("[t]he due process clause protects fundamental justice and fairness")), I cannot agree with the majority's ultimate finding that no due process violation occurred in this case. I, therefore, respectfully dissent from that conclusion.

¶ 81 The essence of respondent's argument on this issue is that the trial court's failure to admonish him of his right to appeal the adjudicatory order making Z.M. a ward of the court violated his constitutionally guaranteed right to due process. It seems clear to me that he is correct in this conclusion.

¶ 82 A parent has a fundamental due process right to the care, custody, and control of his children. *In re Andrea F.*, 208 Ill. 2d 148, 165 (2003). However, the right is subject to termination. *Id.* Because of this, "the procedures employed in this type of proceeding must comply with the requirements of procedural due process." *Id.* "Procedural due process claims question the constitutionality of the procedures used to deny a person's life, liberty, or property." *Lyon*, 209 Ill. 2d at 272. The due process clause mandates that the opportunity to be

heard occur at a meaningful time and in a meaningful manner. *Id.* at 277. A due process issue presents a question of law reviewed *de novo*. *In re Kenneth F.*, 332 Ill. App. 3d 674, 677 (2002).

¶ 83     The Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319 (1976), classified three factors that this court must consider in determining whether due process was given in a proceeding: (1) the private interest implicated by the official action; (2) the risk of an erroneous deprivation of that interest through the proceedings used and the probable value, if any, of additional or substitute safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute safeguards would entail. *Andrea F.*, 208 Ill. 2d at 165. "These same factors are considered in resolving what procedural safeguards are required by the due process clause of the Illinois constitution." *Id.* Our supreme court has applied the *Mathews* factors in cases involving the termination of parental rights. *Id.*

¶ 84     In the instant situation, all of the relevant questions have been answered for us by higher authorities. Relative to the first factor, the founding fathers and the Supreme Courts of the United States and the State of Illinois have determined that a parent has a fundamental due process right to the care, custody, and control of his children and that a parent cannot be deprived of that right without due process of law. The second and third factors relating to the risk of erroneous deprivation and the government's interest have been evaluated and resolved by the Illinois legislature through its enactment of section 1-5(3) of the Juvenile Court Act of 1987 (705 ILCS 405/1-5(3) (West 2016)). The legislature implicitly determined that the removal of a child from the custody of his or her parent through an adjudication transferring wardship to the State (1) posed a risk of erroneous deprivation requiring an opportunity to appeal and (2) that any fiscal and administrative burdens of an appeal did not override the need to provide appellate review. Accordingly, the opportunity to appeal the adjudication of wardship is necessary to due process and, therefore, to fundamental justice and fairness.

¶ 85     The State has conceded that the trial court did not admonish respondent of his right to appeal and presumably also concedes the resulting denial of due process. But the State argues that none of that matters because respondent did not timely file a notice of appeal from the specific orders and this court, therefore, lacks jurisdiction to hear his challenge to the adjudicatory and dispositional orders that were entered in October 2016.

¶ 86     The majority agrees, making a specific finding that we do not have jurisdiction to review the October 2016 orders because no appeal was timely filed. *Supra* ¶ 50. Although the majority acknowledges the *potential* of a due process violation, it finds, as did the State, it does not matter but for a different reason. The majority relies on the fact that respondent is not actually challenging those orders that the legislature deemed he had a right to appeal. The majority has that "out" because, in order to avoid jurisdictional preclusion, respondent has forgone the direct challenge and has instead argued that all orders *subsequent to* the 2016 orders are void because of the due process violation. The majority finds that we do have jurisdiction to review *that* claim. Although not explicitly stated, I believe the majority applied a variant of the "step in the procedural progression" rule in reaching its conclusion. See *Burtell v. First Charter Service Corp.*, 76 Ill. 2d 427, 435 (1979) ("the unspecified judgment is reviewable if it is a step in the procedural progression leading to the judgment specified in the notice of appeal" (internal quotation marks omitted)). I accept that conclusion.

¶ 87     Turning to the merits of the due process argument, I have no problem finding that the trial court's error did, in fact, deprive respondent of notice and an opportunity to be *timely* heard on

- 17 -

the removal of his daughter from his custody and her placement under the wardship of the State. I would also find it beyond dispute that this error constituted an actual and complete violation of respondent's right to due process—a violation that cannot be eradicated or negated by the majority's *post facto* assessment that respondent would not have appealed even if he had known he possessed the right.

¶ 88    Unlike the majority, I believe that, although the question is irrelevant, there is a reasonable likelihood that respondent would have challenged the order of wardship had he known he could. He had joined in the stipulation that Z.M.'s environment was injurious to her, but he was not responsible for that environment. Z.M. was removed from the custodial residence by police who had been called to the home *by respondent*, who was there by permission for agreed-upon visitation with his daughter. He awoke from sleep to the odor of marijuana, and when he objected to its use in the child's presence, he was physically attacked by either the child's mother or the mother's cousin. In an appeal of the wardship decision, respondent could have advanced a reasonable argument that he was fit to have custody and there is a not-unreasonable chance that, absent all of the subsequent proceedings and the mistakes and missteps he later made, he might have succeeded in securing custody of his daughter. He was actually prejudiced by being caught up long term in the often-flawed process for dealing with children deemed to be abused and neglected.

¶ 89    Clearly respondent's constitutional right to due process was violated. The real question is whether the violation can be redressed either by the relief sought by respondent or in any other way. The complete do-over that respondent seeks in this case has some appeal for me simply because it seems fair and is, perhaps, in the ultimate best interest of Z.M. Unfortunately I think any meaningful relief of *this* violation is precluded by the concept of timeliness, not in the jurisdictional sense but by the requirement that notice and the opportunity to be heard occur at a meaningful time and in a meaningful manner. *Lyon*, 209 Ill. 2d at 277. Here I believe the potential for relief has been mooted by all of the very real circumstances that have occurred within this family between October 2016 and now. They all happened, and we cannot make them unhappen, and we cannot rewrite their consequences. In my opinion, there *was* a due process violation, and we cannot redress it.

¶ 90                              Fitness and Best Interest Findings

¶ 91    Turning to the merits of respondent's appeal from the finding of unfitness and the termination of his parental rights, I reach the same conclusion as that reached by the trial court and the majority. I start with a truth that seems to be frequently ignored or discounted by the State in its zealous *judicial* advocacy for uprooted children: there are no perfect parents; there are only degrees of parental imperfection. In this case, the majority has found that Donald failed to comply with the directives in his service plan during the relevant nine-month period, as designated by the State. I would note that he had, nonetheless, taken substantial steps in complying with that plan during the initial nine-month period. During that time, Donald maintained adequate housing and income. He also completed domestic violence courses, completed individual therapy, and completed substance abuse treatment, which included parenting classes. When it became apparent that Donald would need to undergo a *second* round of substance abuse treatment, a miscommunication between Donald and his caseworker about the source of provider information resulted in a delay in his commencement of treatment until

March 2018. He did, however, begin the treatment after the designated nine-month period had ended.

¶ 92 Although Donald's visits with his daughter became "sporadic," this was largely due to his lack of transportation. Even given this limitation, Donald participated appropriately in visits with Z.M., and they had a great relationship. Indeed, although the child called her foster mother "mama," she referred to her foster father as "uncle" and continued to call Donald "dad." Notably, the trial court observed "I could say unequivocally, I understand that [respondent] loves his daughter." Clearly, Donald and his daughter were strongly and lovingly bonded.

¶ 93 Nonetheless, the statutory directive of section 1(D)(m), which states that " 'failure to make reasonable progress toward the return of the child to the parent' includes a parent's failure to substantially fulfill his or her obligations under the service plan" (750 ILCS 50/1(D)(m) (West 2016)), compels a finding that, based on the facts, the trial court's finding of unfitness was not against the manifest weight of the evidence.

¶ 94 For these reasons, I concur with the majority's finding that Donald was properly found unfit and his parental rights were appropriately terminated.