2021 IL App (2d) 210015-U
No. 2-21-0015
Order filed October 14, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* Z.T.M., a Minor | ) | Appeal from the Circuit Court |
| | ) | of Lake County. |
| | ) | |
| | ) | No. 19-JA-203 |
| | ) | |
| (The People of the State of Illinois, | ) | Honorable |
| Petitioner-Appellee v. Brian D. and | ) | Valerie B. Ceckowski, |
| Latoya M., Respondents-Appellants) | ) | Judge, Presiding. |

JUSTICE HUTCHINSON delivered the judgment of the court.
Justices Hudson and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*: The order terminating respondents' parental rights is affirmed as the trial court's findings with respect to respondents' unfitness and the children's best interests were not against the manifest weight of the evidence.

¶ 2    The minor, Z.T.M., was born on February 25, 2018, to his mother, respondent, Latoya M., and his father, respondent, Brian D. On March 9, 2018, a temporary custody order was entered finding Z.T.M. neglected. The order's probable cause finding states

"[Z.T.M.] was born on 2-25-18. His mother is Latoya [D.] and father is Brian [D.] Five other siblings were removed from their parents' care in Wisconsin through an abuse/neglect case. That case remains open."

Z.T.M. was ordered removed from the home and temporary custodianship was granted to the Illinois Department of Children and Family Services (DCFS).

¶ 3    On June 21, 2018, Z.T.M. was adjudicated neglected. The trial court's factual basis for its adjudication finding was duplicative of the probable cause finding in the March 9, 2018, temporary custody order. Also on June 21, 2018, the trial court issued an order of adjudication and disposition, finding Latoya M. and Brian D. unfit or unable to care for Z.T.M. Again, the trial court's factual basis for this finding was duplicative of the probable cause finding in the earlier temporary custody order. Legal guardianship of Z.T.M. was given to DCFS. Latoya M. and Brian D. were ordered to comply with the terms of DCFS's service plans and correct the conditions which required Z.T.M. to be in care.

¶ 4    On September 12, 2019, the State filed a petition to terminate Latoya M. and Brian D.'s parental rights. The State filed an amended petition to terminate their rights on November 10, 2020. The State's petition alleged both parents to be unfit to have a child pursuant to following: (1) failure to maintain a reasonable degree of interest, concern or responsibility as to the minor's welfare (750 ILCS 50/1(D)(b)); (2) failure to make reasonable efforts to correct the conditions which were the basis for the removal of the minor (750 ILCS 50/1(D)(m)(i)); (3) failure to make reasonable progress towards the return of the minor within nine months after an adjudication of neglected minor for the time period between June 21, 2018, and March 21, 2019 (750 ILCS 50/1(D)(m)(ii)); (4) failure to visit the child for a period of 12 months (750 ILCS 50/1(D)(n)(1)(i)); and (5) unable to discharge parental responsibilities due to mental impairment, mental illness, mental retardation or developmental disability, and there is sufficient justification to believe that such inability to discharge parental responsibilities shall extend beyond a reasonable time period (750 ILCS 50/1(D)(p)).

¶ 5    The record presented to this court on appeal does not contain reports of proceedings for the March 9, 2018, hearing on temporary custody, nor the June 21, 2018, adjudication and dispositional hearing. Further, the record presented to this court is devoid of the State's pleadings prior to the September 12, 2019, petition for termination of the respondents' parental rights.

¶ 6    Trial on the State's petition to terminate parental rights commenced on November 10, 2020, with direct examination by the State of Dr. James Gioia, a clinical psychologist. He testified that he had conducted a psychological evaluation of Latoya M. on November 16, 2018. The evaluation included an IQ test (Latoya M. scored a full scale of 65, placing her the mild range of mental retardation), the Bender-Gestalt Visual Motor Test, an academic achievement test, the Millon objective personality test, human figure drawing, projective testing, the Thematic Apperception Technique, and the Rorschach Test. After conducting those tests, it was Dr. Gioia's opinion that Latoya M. "had a very limited amount of time *** interacting with [Z.T.M.] as a mother ***, I felt she was a reactive individual who tends to act before she thinks *** [a]nd those factors appear to correlate with her parenting capacity and would appear to have negative repercussions on her ability to have [Z.T.M.] returned to her care." Dr. Gioia felt that Latoya M. "has a limited capacity to maintain safety for the child."

¶ 7    Dr. Gioia conducted a Parenting Capacity Evaluation of Latoya M. on April 26, 2019. That evaluation went over additional background information for Latoya M., as well as observation of her interaction with Z.T.M. During his observation of Z.T.M. during this interaction, Dr. Gioia noted that Z.T.M. remained in Brian D.'s lap the entire time. Latoya M. never held Z.T.M. in her arms, making it difficult for Dr. Gioia to obtain any actual objective measure of attachment between them. He opined that this was due to Latoya M.'s limited time in caretaking for him.

¶ 8    It was Dr. Gioia's opinion, based on the psychological evaluation and the parenting capacity evaluation, that Latoya M. is unable to safely parent Z.T.M. He indicated that Latoya M. has specific learning disorders, self-medicates with marijuana to ease chronic pain, and suffers from scoliosis, high blood pressure, and anemia.

¶ 9    On cross-examination, Dr. Gioia admitted that Latoya M.'s mild mental retardation does not render her unable to care for Z.T.M. He further admitted that if Latoya M. was able to follow the recommendations made in the psychological evaluation, she may be able to appropriately parent Z.T.M.

¶ 10    On redirect examination, Dr. Gioia testified that Latoya M. was unable to discharge her parenting responsibilities at that time but could become able to do so with psychiatric consultation to determine medication management, ongoing therapy, and parenting classes.

¶ 11    Regarding Brian D., Dr. Gioia testified that he conducted a psychological evaluation on December 10, 2018, in which he administered the same tests as those performed on Latoya M. He concluded that Brian D.'s full scale IQ was in the upper end of the mild range of mental retardation. He found indications of "soft signs suggesting organic dysfunction." He opined that Brian D. had specific learning disabilities in reading, written expression, and mathematics. His diagnostic impression included a diagnosis of "alcohol-use disorder, mild, in early remission since [Brian D.] had indicated that he had stopped drinking; as well as a diagnosis of cannabis-use disorder, mild, in early remission." Based on the results of the psychological evaluation, it was Dr. Gioia's opinion that Brian D.'s "parenting capacity was deficient and limited."

¶ 12    Dr. Gioia conducted a parenting capacity evaluation of Brian D. on April 26, 2019. He primarily considered Brian D.'s comfort level with Z.T.M, and his ability to have Z.T.M. respond comfortably to him. Dr. Gioia testified that he observed Z.T.M. sitting on Brian D.'s knee while

appearing comfortable. He observed that Brian D. also seemed comfortable with his son throughout their interaction. Dr. Gioia stated that he "had a sense that [Brian D.] would be able to further this relationship if he had the opportunity to spend extra time with [Z.T.M.]. However, Dr. Gioia did not believe that Brian D. is capable of parenting Z.T.M. based on mental and psychological factors.

¶ 13    Dr. Gioia admitted, as he had done regarding Latoya M., that Brian D., with psychiatric consultation of medication management, ongoing therapy, and parenting classes, may be able to discharge parental responsibilities with Z.T.M.

¶ 14    Erin Berry, a foster care case manager with Allendale, next testified for the State. Berry had been Z.T.M.'s case worker since his placement in March 2018. She testified that Z.T.M. came into care after a report was received by DCFS that Latoya M. tested positive for THC after giving birth to him in the hospital. Berry stated that Latoya M. had previous involvement with DCFS in Illinois and Wisconsin, wherein Z.T.M.'s five siblings had been removed from the home. Following a relevance objection from Latoya M.'s counsel, the trial court stated that it would consider the siblings' removal for the issue of why Z.T.M. came into DCFS's care, but not for the issue of parental fitness.

¶ 15    Berry evaluated both parents' service plans required to be completed to work towards to goal of Z.T.M.'s return home. The September 2018 service plan, which covered the prior six-month period, required Latoya M.'s cooperation with a psychiatrist, participation in individual counseling, family therapy, and administration of certain psychotropic medications. Berry rated Latoya M. unsatisfactory in this plan because, even though she had completed an assessment, she had not followed up with recommendations for services. No proof had been provided that Latoya M. had engaged in individual therapy or taken the required psychotropic medications.

Additionally, the September 2018 service plan required Latoya M. to participate in anger management. Berry rated her unsatisfactory for failure to follow up with recommendations for that service. Berry did rate Latoya M. satisfactory for cooperation with Allendale, completion of parenting classes, and completion of a substance abuse course. The September 2018 service plan created a task for Latoya M. to engage with a parenting coach. Overall, Latoya M. was rated unsatisfactory on the service plan because Berry didn't observe "satisfactory progress in service towards reunification."

¶ 16    As to Brian D., Berry testified that he was rated satisfactory in the September 2018 service plan for cooperating with substance abuse treatment as he was actively participating in a substance abuse class.  He was rated unsatisfactory in all other areas, including participation in individual counseling, family therapy, participation in parenting class, and participation in anger management. Brian D. was rated unsatisfactory on the service plan because he "didn't have satisfactory progress towards reunification."

¶ 17    Berry next testified to her evaluation of the respondents' service plan for the period of September 2018 to February 2019. Latoya M. unsatisfactory for mental health treatment because she attended only one of ten sessions for mental health counseling, although Berry stated that several sessions were missed due to inclement weather. Latoya M. was also inconsistent in seeing her psychiatrist. As to Latoya M's substance abuse treatment, Berry rated her unsatisfactory for several missed toxicology screenings, as well as positive tests for THC on the screenings she did undertake. She was rated unsatisfactory for parenting due to inconsistent attendance with her parenting coach. Latoya M. was rated satisfactory for cooperation with Allendale. Overall, Latoya M. was given an unsatisfactory rating on the service plan.

¶ 18    Brian D. was rated unsatisfactory on the September 2018 to February 2019 service plan for anger management because he had "just recently started to engage with NICASA for mental health services, but had not yet completed services." Berry rated Brian D. unsatisfactory for substance abuse due to him having missed several toxicology screens, as well as testing positive for THC. Although Brian D. had reengaged with NICASA for mental health services, Berry rated him unsatisfactory for failure to attend any of the requisite services. His participation with parent coaching, as well as visitation with Z.T.M., was inconsistent and rated unsatisfactory. Berry rated him satisfactory for being cooperative with Allendale, but rated Brian D. unsatisfactory overall on the service plan.

¶ 19    Berry then testified to the service plan covering February 2019 to August 2019. Latoya M. was given an overall unsatisfactory rating because she evinced less engagement in services and visitation with Z.T.M. Latoya M. received an unsatisfactory rating for substance abuse due to more missed toxicology screening, as well as positive tests for THC. However, Berry admitted that Latoya M. was not referred for additional substance treatment after June 2018. Latoya M. received an unsatisfactory rating for mental health services because she continued to miss appointments with her psychiatrist. Her psychiatrist was unable to confirm whether Latoya M. was compliant with her medications. Berry rated Latoya M. unsatisfactory for parenting because she was discharged from parent coaching due to inconsistent visitation. She was rated satisfactory as to anger management and continued cooperation with Allendale.

¶ 20    Brian D. was also given an overall rating of unsatisfactory on the February 2019 to August 2019 service plan. He was rated unsatisfactory as to compliance with Allendale, mental health services, substance abuse services, anger management, and parenting.

¶ 21    Berry testified that both respondents had inconsistent visits with Z.T.M. Neither respondent had visited Z.T.M. since October 30, 2019. Prior to October 30, 2019, respondents attended less than half of their scheduled visits with Z.T.M. When they did visit Z.T.M., Berry said there "was not a lot of interaction" between respondents and Z.T.M. She said Z.T.M. eventually "became less and less comfortable" as respondents' visits became less consistent over time. Berry stated that she had regular conversations with respondents about how Allendale could help them more regularly attend services and get reengaged with NICASA for mental health services. She noted that the State filed the original petition to terminate respondents' parental rights on September 12, 2019, but the visitation plan with Z.T.M. did not change until June 2020, and there was no court order that stopped respondents from visiting.

¶ 22    On cross-examination by respondents' counsel, Berry stated that she had concerns about Brian D. and Latoya M.'s ability to function as parents. Her main concerns were around substance abuse. Berry admitted that Latoya M. obtained a medical marijuana card in 2019, and some of her positive tests for THC occurred after this time. Berry further admitted that respondents were consistent in attending court hearings, attending administrative case reviews, and maintaining communication with Berry during their time involved with Allendale. Respondents were aware of the pending petition for termination of parental rights when they made their last visit with Z.T.M. on October 30, 2019.

¶ 23    On cross-examination by the guardian *ad litem*, Berry reiterated her concern with the visits as respondents did not interact much with their infant son. She stated that both respondents fed him a bottle and held him, but spent much of the visits on their phones. As time went on and the visits became more infrequent, Z.T.M. would cling to the parenting coach, case aid, or Berry herself.

¶ 24     In finding respondents unfit as to all allegations in the State's amended petition to terminate their parental rights, the trial court stated

"The Court has considered all of the evidence and testimony and finds that the State has met their burden of proof *** as to each allegation ***. [Subsection] B, they failed to maintain a reasonable degree of interest, concern, or responsibility as to the minor's welfare. That is shown by attending less than half of their visits. That's not a reasonable interest in the minor. And while parents may have had their own issues and do have their own issues, there's been no explanation given for their lack of cooperation with visitation and their behavior during visitation.

The Court also finds [subsection] m(i), that parents failed to make reasonable efforts to correct the conditions which were the basis for the removal of the minor. This section requires a subjective standard of review, but the record reflects that even with parents' limitations, they did not put forth reasonable efforts to correct the conditions which were the basis of the removal of the minor. They chose not to use the resources that were available to them, in spite of the best efforts of their caseworker.

[Subsection] [m](i)(i) *** is failure to make reasonable progress. This requires the Court to view the progress in an objective standard during each of the nine-month periods listed; and during each of those periods, [respondents] were rated overall unsatisfactory as to tasks and services, and this Court finds that the parents failed to make any type of reasonable progress towards a return home goal objectively.

As to allegation [subsection] n(1)(i), the Court finds *** that there has been more than 12 months since the parents visited the minor; the last visit being 10/19 of '19 ***.

And then as to allegation [subsection]P, while Dr. Gioia made recommendations for services that would have assisted the parents in working towards the return goal, parents did not cooperate with those services that were recommended. These *** psychological and parenting capacity [evaluations] were completed between [December] of 2018 and 4/26 of 2019.

Recommendations were implemented by the caseworker, but parents did not comply. And while their low level of functioning *** does not automatically exclude them from parenting, their lack of follow-through made it impossible for them to discharge their parental responsibilities, and the Court finds based on the testimony and the evidence submitted that this inability will extend beyond a reasonable period of time. The minor has been in care since March of 2018, and we are no closer to a return home about two-and-a-half years later."

¶ 25    The case then proceeded to the best interest phase. The State called Berry to testify. She stated that Z.T.M. has been in his current foster home since the opening of the case. She had visited him in the foster home at least twice per month since March 2018. Z.T.M. lives in a single-family home, has his own room, an attached playroom, and toys in every room of the house. Z.T.M. calls his foster parents "Mommy" and "Daddy", and feels comfortable, loved, and part of the family. Berry testified that Z.T.M. suffered from chronic respiratory problems. But since being in his foster home, he has been seeing a physician and is no longer in need of daily medication.

¶ 26    Although Z.T.M. does not have contact with any of his eight biological siblings, Berry believed it was in his best interest that he be made available for adoption. Berry also felt his foster parents would be open to allowing contact with Z.T.M.'s siblings, but no efforts had yet been made to do so. The foster parents treat Z.T.M. as a member of their family and he sees them as his

primary caretakers. Removing him from the home, Berry stated, would be detrimental to his well-being. Z.T.M. is biracial and his foster parents are white. However, Berry testified that he attends a diverse day care and his foster parents try to be active in the community.

¶ 27    CASA volunteer, Kathleen Lawler, was called to testify. She had been the minor's CASA since the initiation of the case. Lawler has visited Z.T.M. over fifty times since then. She also stated that it would be detrimental to remove him from his foster parents and that termination of respondents' parental rights was in his best interest to allow for adoption in his current home.

¶ 28    The trial court ruled that the State had met its burden, and found it was in Z.T.M.'s best interest that respondents' rights be terminated.

¶ 29    Respondents filed a timely notice of appeal and received appellate counsel.  On March 3, 2021, then-appellate counsel filed a motion to withdraw pursuant to *Anders v. California*, 386 U.S. 738, 744-45 (1986). This court denied the motion with prejudice, citing failure to argue two non-frivolous issues identified by then-appellate counsel himself. We also identified a potential conflict between Latoya M. and Brian D.'s appeals and ordered that each respondent receive their own respective independent counsel. Following the completion of briefing, the case was ready for this court's review on July 26, 2021.[1]

---

[1] With respect to cases affecting the best interests of children, Illinois Supreme Court Rule 311(a)(5) (eff. July 1, 2018) provides in relevant part that, "[e]xcept for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." We have good cause for issuing our opinion more than 150 days after the filing of the notice of appeal as the case was not ready for final disposition because of the need to appoint new appellate counsel after the denial of original appellate counsel's motion to withdraw.

¶ 30                                    ANALYSIS

¶ 31    Each respondent appeals the trial court's order on all five findings of unfitness, as well as its finding that Z.T.M.'s best interests are served in terminating Latoya M. and Brian D.'s parental rights. After reviewing the record on appeal, as well as respondents' briefs presented to this court, we begin our analysis of the trial court's findings as to Latoya M. and Brian D.'s unfitness pursuant to sections 1(D)(m)(i) and 1/(D)(p) of the Adoption Act. 750 ILCS 50/1(m)(i), (p) (West 2018).

¶ 32    A parent's right to raise his or her biological child is a fundamental liberty interest, and the involuntary termination of such right is a drastic measure. *In re B'Yata I.*, 2013 IL App 2d 130558, ¶ 28. Accordingly, the Juvenile Court Act of 1987 provides a two-stage process for involuntary termination of parental rights. 705 ILCS 405/2–29(2) (West 2018). Initially, the State must prove that the parent is unfit. 705 ILCS 405/2–29(2), (4) (West 2018); 750 ILCS 50/1(D) (West 2016); *B'Yata I.*, 2013 IL App 2d 130558, ¶ 28. If the court finds the parent unfit, the State must then show that termination of parental rights would serve the child's best interests. 705 ILCS 405/2–29(2) (West 2016); *B'Yata I.*, 2013 IL App 2d 130558, ¶ 28.

¶ 33    With respect to the first stage of the termination process, section 1(D) of the Adoption Act (750 ILCS 50/1(D) (West 2018)) lists various grounds under which a parent may be found unfit. *In re Antwan L.,* 368 Ill. App. 3d 1119, 1123 (2006). The State has the burden of proving a parent's unfitness by clear and convincing evidence. 705 ILCS 405/2–29(2), (4) (West 2018); *In re Antwan L.,* 368 Ill. App. 3d at 1123. A determination of parental unfitness involves factual findings and credibility assessments that the trial court is in the best position to make. *In re Tiffany M.,* 353 Ill. App. 3d 883, 889–90 (2004). The decision of a trial court with respect to a determination of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Gwynne P.*, 215 Ill. 2d 340, 349 (2005). A finding is against the manifest weight

of the evidence only where the opposite conclusion is clearly apparent or the determination is unreasonable, arbitrary, or not based on the evidence presented. *In re Addison R.*, 2013 IL App (2d) 121318, ¶ 22.

¶ 34    Section 1(D)(p) of the Adoption Act provides the standard for finding the parent unfit to have a child based on mental inabilities:

> "[I]nability to discharge parental responsibilities supported by competent evidence from a psychiatrist, licensed social worker, or clinical psychologist of mental impairment, mental illness or an intellectual disability *** and there is sufficient justification to believe that such inability to discharge parental responsibilities shall extend beyond a reasonable time period."

The analysis required involves two steps. It must first be shown by competent evidence that the parent suffers from a mental inability sufficient to prevent him or her from discharging a parent's normal responsibilities. *In re E.J.F.*, 161 Ill App. 3d 325, 331 (1987). Second, there must be sufficient justification to find that the inability shall extend beyond a reasonable time period. *In re E.J.F.*, 161 Ill. App 3d at 331. "[A] low IQ does not automatically translate into an inability to discharge parental responsibilities[,]" rather it must be shown that the mental disability prevents the parent from discharging their parental responsibilities for longer than a reasonable time period. *In re Cornica J.*, 351 Ill. App. 3d 557, 569 (2004).

¶ 35    Dr. Gioia's testimony at trial as to Latoya M.'s ability to discharge parental responsibilities under the auspices of section 1/(D)(p) of the Adoption Act was not sufficient to meet the first prong of the above analysis. Dr. Gioia testified that Latoya M.'s IQ placed her in the mild range of mental retardation, but admitted that this did not mean she was unable to parent Z.T.M. Further,

Dr. Gioia diagnosed Latoya M. with generalized anxiety disorder, but admitted that such a disorder would not hinder her ability to parent if addressed through counseling or medication.

¶ 36    Dr. Gioia's testimony regarding Brian D. was similar to that of Latoya M. He stated that Brian D.'s IQ placed him in the mild range of mental retardation and diagnosed him with "alcohol-use disorder, mild, in early remission *** as well as a diagnosis of cannabis-use disorder, mild, in early remission." Further, Dr. Gioia admitted that if addressed, the issues affecting both Brian D. and Latoya M. would not preclude them from being able to discharge their parenting duties. He acknowledged dealing with parents throughout his career as a clinical psychologist who suffered from levels of mental retardation or mental illness that precluded their ability to parent. When asked by counsel if Brian D. and Latoya M. were such parents, Dr. Gioia admitted that they were not.

¶ 37    Based on the foregoing, the State did not prove by clear and convincing evidence that either respondent is unable to discharge parental responsibilities due to mental impairment, mental illness, mental retardation, or developmental disability. Even if we were to agree that the State was able to prove the first prong of the analysis required of section 1(D)(p) of the Adoption Act, Dr. Gioia's testimony explicitly stated that any such inability could be corrected with adherence to his recommendations. The trial court's finding that Brian D. and Latoya M. are unfit to parent Z.T.M. pursuant to section 1(D)(p) of the Adoption Act was against the manifest weight of the evidence.

¶ 38    We now turn to the trial court's finding of respondents' unfitness to parent Z.T.M. pursuant to section 1(D)(m)(i) of the Adoption Act. The trial court's finding that Brian D. and Latoya M. "failed to make reasonable efforts to correct the conditions which were the basis for the removal of the minor" was not necessarily made in error, however the record presented to this court raises concerns as to how the trial court arrived at that finding.

¶ 39    A parent may be found unfit for his or her failure "(i) to make reasonable efforts to correct the conditions that were the basis for the removal of the child from the parent during any 9-month period following the adjudication of neglected or abused minor *** or (ii) to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(i), (ii) (West 2018). Whether a parent has made reasonable efforts to correct the conditions that were the basis for the child's removal is judged by a subjective standard based upon the amount of effort that is reasonable for a particular person. *In re Jacorey*, 2012 IL App (1st) 113427, ¶ 21.

¶ 40    As articulated above, the stated basis for Z.T.M.'s removal in the March 9, 2018, temporary custody order, and the factual basis found in both the trial court's adjudication and dispositional rulings was

> "[Z.T.M.] was born on 2-25-18. His mother is Latoya [D.] and father is Brian [D.] Five other siblings were removed from their parents' care in Wisconsin through an abuse/neglect case. That case remains open."

However, the DCFS services plans contained in the record describe the following as the reason the case was opened as to Latoya M.:

> "[Z.T.M.] and [Latoya M.] tested positive for marijuana at the hospital following [Z.T.M.'s] birth. Both parents have several other children who have been removed from their care and are currently in foster care in another state."

As to Brian D., the September 6, 2018, DCFS service plan states that he was removed from the hospital following Z.T.M.'s birth for being threatening to hospital staff. No further specifics appear anywhere in the record before this court.

¶ 41    The trial court noted in its unfitness findings that the factual basis for Z.T.M.'s removal

was "the parents had five siblings removed from their care in Wisconsin due to abuse and neglect and that the Wisconsin case *** still remained open when the minor was born." In finding respondents unfit pursuant to section 1(D)(m)(i) of the Adoption Act, the trial court found

> "[T]he record reflects that even with parents' limitations, they did not put forth reasonable efforts to correct the conditions which were the basis of the removal of the minor. Then chose not to use the resources that were available to them, in spite of the best efforts of their caseworker."

The State did not introduce any evidence in this case as to respondents' requirements in the Wisconsin case. Nor did the State introduce any evidence as to whether respondents had corrected the basis for Z.T.M.'s siblings' removal. We cannot even be sure whether those siblings have or have not been returned to respondents' care.

¶ 42    Section 2-21 of the Juvenile Court Act of 1987 states

> "If the court finds that the minor is abused, neglected, or dependent, the court shall then determine and put in writing the factual basis supporting that determination, and specify, to the extent possible, the acts or omissions or both of each parent, guardian, or legal custodian that form the basis of the court's findings. That finding shall appear in the order of the court." 705 ILCS 405/2-21 (West 2018).

This court lacks jurisdiction to review the trial court's dispositional order as it was entered far in excess of 30 days from the notice of appeal in the present case. See Ill. S. Ct. R. 303(a), (d) (eff. July 1, 2017); see also *In re Z.M.*, 2019 IL App (3d) 180424, ¶ 50 (finding the court lacked jurisdiction to review the propriety of the dispositional orders following an appeal from the termination of parental right because a timely appeal was not filed from those orders). As such we will make no ultimate finding as to whether the trial court's finding of respondents' unfitness

pursuant to section 1(D)(m)(ii) of the Adoption Act was in error. However, we caution the State and trial courts to follow the strictures of the Juvenile Court Act by clearly articulating "in writing the factual basis supporting that determination, and specify, to the extent possible, the acts or omissions or both of each parent, guardian, or legal custodian that form the basis of the court's findings." 705 ILCS 405/2-21 (West 2018). This court will not accept less than statutory compliance when removal of a child from the custody of his parents is at stake. Allowing the State and trial court to go through, what appears from the record before us, a less-than-statutorily-compliant removal of Z.T.M. from respondents, who have undoubtedly had problems parenting several other children, would be an abdication of our responsibilities as a reviewing court.

¶ 43    Section 2-21 of the Juvenile Court Act of 1987 goes on to state

> "If the court finds that the child has been abused, neglected or dependent, the court shall admonish the parents that they must cooperate with the Department of Children and Family Services, comply with the terms of the service plan, and correct the conditions that require the child to be in care, or risk termination of parental rights."

The order of adjudication and dispositional order contained in the record on appeal indicate that both Latoya M. and Brian D. were present in court on June 21, 2018, and admonished by the trial court that their cooperation with the edicts of DCFS was required. As we have articulated, no report of proceedings from that hearing is contained within the record before us. An appellant has the burden to present a sufficiently complete record of the proceedings, and in the absence of such a record on appeal, it will be presumed that the order entered by the trial court was in conformity with law and had a sufficient factual basis. *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984).

¶ 44    This brings us to respondents' contention that the trial court erred in finding them unfit pursuant to section 1(D)(m)(ii) of the Adoption Act. Unfitness under this section of the Adoption

Act is described as "[f]ailure by a parent *** to make reasonable progress toward the return of the child to the parent during any 9-month period following the adjudication of neglected or abused minor." 750 ILCS 50/1(D)(m)(ii) (West 2018).

¶ 45    Reasonable progress is an objective standard, which exists when a parent's progress in complying with directives given for the return of the children is sufficiently demonstrable that the court, in the near future, will be able to order the child returned to parental custody. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88. It includes compliance with service plans and court directives considering the conditions that gave rise to the child's removal and other later-known conditions that would prevent the court from returning custody to the parent. *In re C.W.*, 199 Ill. 2d 198, 213-14 (2002).

¶ 46    The State's amended petition for termination of respondents' parental rights alleges that they failed "to make reasonable progress towards the return of the minor within nine months after an adjudication of neglected minor for the time period between June 21, 2018, and March 21, 2019." The DCFS service plans and testimony presented at trial support the trial court's findings as to this allegation.

¶ 47    During the course of the case, Brian D. and Latoya M. were cooperative with Allendale and received satisfactory ratings for those efforts. Each respondent would complete a task required by DCFS's service plan and receive a satisfactory rating, but neither Brian D. or Latoya M. ever maintained an overall satisfactory rating on their plans. They never made substantial progress towards the return of Z.T.M. to their care. Brian D. was repeatedly rated unsatisfactory for substance abuse, engagement with mental health services, participation in individual counseling, family therapy, participation in parenting class, and anger management. Latoya M. consistently failed to engage in mental health counseling, see her psychiatrist, and attend meetings with her

parenting coach. Participation in services and visitation by both respondents was inconsistent throughout the entirety of the case, justifying their unsatisfactory ratings towards making reasonable progress towards reunification with Z.T.M. Therefore, the trial court's finding that the State proved by clear and convincing evidence that Brian D. and Latoya M. are unfit to parent Z.T.M. pursuant to section 1(D)(m)(ii) of the Adoption Act was not against the manifest weight of the evidence.

¶ 48     The State need only prove one statutory factor of unfitness to effectuate the termination of parental rights. *In re A.S.B.*, 393 Ill. App. 3d 836, 843 (1997).  A reviewing court need not consider other findings of unfitness when there is sufficient evidence to satisfy any one statutory ground. *Id*. Having found no error in the trial court's findings of unfitness under section 1(D)(m)(ii) of the Adoption Act, we need not reach respondents' remaining unfitness contentions.

¶ 49     Finally, we address each respondent's contention that the State failed to prove that it was in Z.T.M.'s best interests that their parental rights be terminated.  Once the trial court finds a parent unfit, it must determine whether termination of parental rights is in the minor's best interests. *B'Yata I.*, 2013 IL App 2d 130558, ¶ 41.  Section 1–3(4.05) of the Adoption Act (705 ILCS 405/1–3(4.05) (West 2018)) sets forth various factors for the trial court to consider in assessing a child's best interests. *B'Yata I.*, 2013 IL App 2d 130558, ¶ 41.  The State bears the burden of proving by a preponderance of the evidence that termination is in the best interests of the minor.  *Id.*   A trial court's best-interests finding will not be disturbed on appeal unless it is against the manifest weight of the evidence.  *Id.*  A decision is against the manifest weight of the evidence only if an opposite conclusion is clearly apparent.  *Id.*

¶ 50     Brian D. has forfeited any argument as to the trial court's best interest findings for failure to present any argument in his brief. Points not argued are forfeited and shall not be raised in the

reply brief, in oral argument, or on petition for rehearing. Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Latoya M., in her brief to this court, admits that Z.T.M. was placed "in a foster home where he feels safe and comfortable." She further admits that the statutory factors analyzed by the trial court in making its best interest determination "weigh heavily in finding it is in the best interest of the minor to terminate parental rights." However, she argues, the racial disparity between Z.T.M. and his foster parents, coupled with his estrangement from his eight other siblings, renders the trial court's finding incorrect in light of the preponderance of the evidence presented. We disagree.

¶ 51　　The trial court considered Z.T.M. and his foster parents' racial makeup when delivering its findings. To wit:

> "Yes, the minor is biracial and the [foster] parents are Caucasian, but they are doing their best, according to the testimony of Ms. Berry, to integrate the minor not only to their household, but to learn how to care for the minor and are willing to take additional training to meet *** other biracial children."

The trial court also heard testimony at the best interest hearing from Berry that she was certain that Z.T.M.'s foster parents would be open to facilitating visits with his siblings. We can find no error with the trial court's determination that the preponderance of the evidence supports finding it in Z.T.M.'s best interests to terminate Brian D. and Latoya M.'s parental rights.

¶ 52　　For the reasons stated, we affirm the judgment of the circuit court of Lake County.

¶ 53　　Affirmed.