NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240630-U

NOS. 4-24-0630, 4-24-0631 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
July 23, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* L.R., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Sangamon County |
|     Petitioner-Appellee, | ) | No. 22JA114 |
|     v.    (No. 4-24-0631) | ) | |
| Jacquelyn R., | ) | |
|     Respondent-Appellant). | ) | |
| | ) | |
| | ) | No. 22JA116 |
| *In re* J.R.-M., a Minor | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | |
|     Petitioner-Appellee, | ) | |
|     v.    (No. 4-24-0630) | ) | Honorable |
| Jacquelyn R., | ) | Karen S. Tharp, |
|     Respondent-Appellant). | ) | Judge Presiding. |

JUSTICE KNECHT delivered the judgment of the court.
Justices Doherty and Vancil concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The appellate court affirmed, concluding (1) the trial court's unfitness and
best-interest findings were not against the manifest weight of the evidence and
(2) respondent forfeited her claim alleging a due process violation.

¶ 2    Respondent mother, Jacquelyn R., appeals the trial court's judgments terminating
her parental rights to her son, J.R.-M. (born February 2021), and daughter, L.R. (born June 2013).
On appeal, respondent challenges the court's unfitness and best-interest findings and raises, for the
first time, an alleged due process violation. For the reasons that follow, we affirm the court's
judgments.

¶ 3                        I. BACKGROUND

¶ 4                A. Motions to Terminate Parental Rights

¶ 5        In December 2023, the State filed motions to terminate respondent's parental rights to the minors. In the motions, the State alleged respondent was an unfit parent in that she (1) failed to maintain a reasonable degree of interest, concern, or responsibility as to the minors' welfare (750 ILCS 50/1(D)(b) (West 2022)); (2) failed to make reasonable efforts to correct the conditions which were the basis for the removal of the minors from her care within a nine-month period following the minors' adjudications of neglected, namely, October 19, 2022, to July 19, 2023 (*id.* § 1(D)(m)(i)); and (3) failed to make reasonable progress toward the return of the minors to her care within a nine-month period following the minors' adjudications of neglected, namely, October 19, 2022, to July 19, 2023 (*id.* § 1(D)(m)(ii)). The State further alleged it was in the minors' best interests to terminate respondent's parental rights and appoint the Illinois Department of Children and Family Services (DCFS) as guardian, with the power to consent to adoption.

¶ 6            B. Hearing on Motions to Terminate Parental Rights

¶ 7        In April 2024, the trial court held a hearing on the State's motions to terminate respondent's parental rights to the minors. Respondent appeared at the hearing with counsel.

¶ 8            1. *Respondent's Interruptions and Nonresponsive Answers*

¶ 9        Throughout the hearing, respondent was repeatedly told, by both the trial court and her counsel, to not interrupt the proceeding. Her persistent interruptions led to her temporary removal from the courtroom on three separate occasions. Respondent also was repeatedly told, again by both the court and her counsel, to answer the questions asked of her while testifying. The answers given remained largely nonresponsive.

¶ 10                2. *Unfitness Portion of the Hearing*

¶ 11 During the unfitness portion of the hearing, the trial court took judicial notice of orders entered in the minors' cases, heard testimony from two caseworkers and respondent, and received eight service plans as exhibits. The following is gleaned from the evidence before the court.

¶ 12 In April 2022, the minors were taken into DCFS care after a call was made to the DCFS hotline reporting respondent and the minors resided in a mouse-infested home with dirty dishes, rotten food, dead mice, and mouse feces throughout. At the time, intact services was involved. Intact services noted respondent's mental health could have contributed to the unsanitary home conditions. Intact services had information indicating respondent was previously diagnosed with schizophrenia, bipolar disorder, and borderline personality disorders. Respondent refused to provide intact services with her provider's information to confirm the diagnoses. On October 19, 2022, the minors were adjudicated neglected pursuant to section 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(b) (West 2022)) based upon the conditions of the home and respondent's failure to cooperate with intact services. The minors were later made wards of the court.

¶ 13 Since May 2022, it had been recommended respondent engage in certain services. Because respondent failed to schedule an appointment to complete an integrated assessment, the recommended services were based upon an investigative report detailing the reasons the minors were taken into DCFS's care. It was recommended respondent engage in mental-health services, which included completing a psychological examination and a mental-health assessment and participating in any recommended treatment, and parenting services, which included engaging in parenting coaching and completing classes. It was also recommended respondent cooperate with DCFS, which included executing releases of information, obtaining and maintaining suitable

housing and income, and attending visits with the minors. Respondent was repeatedly informed of the recommended services and the importance of completing them.

¶ 14 As for the recommended mental-health services, in May 2022, respondent was scheduled for a psychological evaluation and a mental-health assessment. In July 2022, respondent declined to participate in the mental-health assessment, believing mental-health services were unnecessary. Respondent then failed to appear at the psychological evaluation, which was scheduled in September 2022. In March 2023, respondent completed the mental-health assessment, which resulted in a finding respondent would benefit from counseling services. The assessment did not provide any diagnoses. In April 2023, a second referral was made for a psychological evaluation, but the referral was denied because respondent was not participating in services at the time. A counseling session was scheduled in late 2023, which respondent failed to attend. The counseling provider tried to reschedule the appointment but did not hear from respondent. As of the date of the hearing, respondent was not engaged in counseling and had not completed the psychological evaluation.

¶ 15 With respect to the recommended parenting services, respondent was referred to a parenting program in June 2022. The program involved in-person coaching and remote classes. Respondent was discharged from the program in July 2022 for failing to participate. Respondent was again referred to the program in August 2022. At that point, respondent communicated with a parenting coach but then failed to meet with the coach "on a couple of occasions" and failed to attend the parenting classes. In March 2023, respondent was discharged for lack of engagement. Respondent was again referred to the program in July 2023 but was then discharged in August 2023. The parenting provider concluded respondent would not benefit from the parenting program until she received mental-health treatment. As of the date of the hearing, respondent was not

engaged in a parenting program.

¶ 16 As for the recommended cooperation with DCFS, respondent initially refused repeated requests to execute releases of information. Respondent's refusals prevented DCFS from receiving information about respondent. Respondent refused to execute the releases out of a reported fear of her information being shared with family members. She did not accept the explanation provided to her that the information would not be shared. Eventually, in March 2023, respondent executed the requested releases. As for respondent's communication with DCFS, it was generally described as follows: "There were days and weeks where she would reach out fairly regularly. I would hear from her multiple times a day, multiple days a week. And then there were times where I wouldn't hear from her for three or four weeks at a time."

¶ 17 With respect to the recommendation respondent obtain and maintain suitable housing and income, respondent was evicted from her home in June or July 2022. Since that time, she had resided at various shelters. Respondent was repeatedly informed of providers who could assist her in finding housing and, at one point, she indicated she had reached out to some of those providers and was in the process of obtaining housing. Respondent was also informed DCFS was able to provide financial housing assistance once the minors were within 60 days of being returned to her custody. As of the date of the hearing, respondent had not obtained suitable housing or income.

¶ 18 And finally, as to the recommended visits with the minors, respondent was offered supervised visits once a week for two hours. The caseworker estimated respondent missed a total of approximately six months of visits, most of which were "no call, no shows." As for the visits respondent attended, she would occasionally bring snacks and gifts for the minors. Some of the visits were described as "chaotic," with the minors refusing to listen to adults and respondent not

paying attention to the minors. The visit supervisor reported an incident where respondent discussed with L.R. the topics of homelessness, drugs, and sex. When respondent was informed the discussion was inappropriate, she indicated she believed L.R. was mature enough for the discussion.

¶ 19 Respondent's progress on the service recommendations was evaluated at administrative case reviews approximately every six months. Respondent was informed of the case reviews by mail and text message. The notifications sent by mail were directed to a specific shelter identified by respondent for forwarding mail. As for the notifications sent by text message, respondent would, at times, respond to the text messages, asking about the case reviews. Respondent was provided with the option of calling in to the case reviews. Respondent did not attend the case reviews. She was ultimately found to have unsatisfactory progress on each of the service plans evaluated in the minors' cases.

¶ 20 Respondent was offered the opportunity to attend child and family team meetings. Respondent attended a meeting in March 2023. She arrived an hour late for the meeting. She did not attend additional meetings.

¶ 21 Respondent reported issues with maintaining a cell phone. Throughout DCFS's involvement, respondent had approximately five or six different cell phones. Respondent reported her cell phones were stolen or destroyed. The reports usually came after a period of no communication with respondent.

¶ 22 Respondent also reported transportation issues. She was informed about the availability of bus tokens to complete her services. Respondent did not request bus tokens or other transportation assistance.

¶ 23 The caseworker who was primarily assigned to the minors' cases had concerns with

respondent's mental health. The caseworker observed respondent struggled to stay focused, often provided nonresponsive answers to questions posed to her, and expressed paranoid thoughts about her information being shared with others. The caseworker believed mental-health services were necessary before the minors could be returned to respondent's care.

¶ 24　　　　　Respondent testified the State had "no reason to take away the children from [her] because this is not a criminal issue." When asked about the recommended mental-health services, respondent testified she did not believe it would be "conducive" to complete the psychological evaluation until most of her other services were completed. She refused to answer any questions about her mental health, including any prior diagnoses. When asked about the recommended parenting services, respondent testified she had "at least one or two parenting classes over the phone" and tried to have parenting coaching over the phone. She acknowledged, with respect to the recommended visits with the minors, she missed visits but disagreed with the estimated number of missed visits. Respondent testified she was aware of only the first administrative case review. Respondent testified to the difficulties she faced while homeless, including being the victim of crimes. She also testified to the difficulties of having a lack of transportation and financial resources. Respondent acknowledged she had not completed any of the recommended services but maintained she made reasonable efforts and progress toward completing them.

¶ 25　　　　　Based on this information, the trial court found respondent was an unfit parent for the reasons alleged in the State's motions to terminate parental rights.

¶ 26　　　　　　　　　　3. *Best-Interest Portion of the Hearing*

¶ 27　　　　　During the best-interest portion of the hearing, the trial court took judicial notice of the evidence presented during the fitness portion of the hearing and heard testimony from a caseworker and respondent. The following is gleaned from the evidence before the court.

¶ 28　　　　The minors had been placed with their foster mother, who was their maternal great grandmother, since March 2022. As of the date of the hearing, J.R.-M. was 3 years old and L.R. was 10 years old. The minors were "thriving" in the foster home and bonded to their foster mother. L.R. was doing well in school and taking honors classes. J.R.-M. was about to begin preschool. The minors behaved in the foster home and followed the rules set by their foster mother. The needs of the minors were being met. The foster mother, who was 82 years old as of the date of the hearing, was willing and able to provide the minors with permanency through adoption. The foster mother was described by both the caseworker and respondent as an active 82-year-old. The foster mother was retired and able to be with the minors throughout the day. She also had the financial ability to provide for the minors' needs. The minors had multiple aunts and uncles who lived nearby and helped care for the minors. Several of the aunts and uncles were committed to caring for the minors if anything happened to their foster mother. DCFS found the commitment from the aunts and uncles alleviated its concerns with the foster mother's age. Although respondent described the foster mother as "a little bit overly critical" at times, respondent acknowledged the foster mother was "a very good grandmother and great grandmother."

¶ 29　　　　The minors last visited with respondent three or four weeks prior to the hearing. The caseworker observed a bond between respondent and J.R.-M.; the caseworker did not observe the same between respondent and L.R. Respondent believed the minors were bonded to her. Respondent had not completed the recommended services.

¶ 30　　　　DCFS believed it would be in the minors' best interests to terminate respondent's parental rights. Respondent believed she had "not done anything illegal to deserve my rights to be terminated."

¶ 31　　　　Based on this information, the trial court, after considering the statutory

best-interest factors, found it would be in the minors' best interests to terminate respondent's parental rights. The court terminated respondent's parental rights to each of the minors.

¶ 32       This appeal followed.

¶ 33                              II. ANALYSIS

¶ 34       On appeal, respondent challenges the trial court's unfitness and best-interest findings and raises, for the first time, an alleged due process violation.

¶ 35                         A. Timeliness of Decision

¶ 36       As an initial matter, we must address the timeliness of our decision. This appeal has been designated as accelerated pursuant to Illinois Supreme Court Rule 311 (eff. July 1, 2018). Rule 311(a)(5) states, in part, "Except for good cause shown, the appellate court shall issue its decision within 150 days after the filing of the notice of appeal." Ill. S. Ct. R. 311(a)(5) (eff. July 1, 2018). In this case, respondent filed multiple motions for an extension of time to file an appellate brief, all of which we granted. The delays caused by respondent resulted in this court not receiving this case for disposition until after the 150-day deadline had passed. Under these circumstances, we find the existence of good cause for the late decision.

¶ 37                       B. Respondent's Appellate Brief

¶ 38       We must also initially address the sufficiency of respondent's appellate brief. As the State raises in its appellee brief, respondent's appellate brief fails to meet the requirements of our supreme court rules. Specifically, in violation of Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), the argument section of respondent's brief does not reference the pages of the record relied upon and, moreover, presents claims which are not supported by developed argument and citation to relevant authority. While this court would be within its discretion to strike respondent's appellate brief and dismiss the appeal for the failure to comply with our supreme court rules, we

will proceed to address the appeal on the merits as best we can based upon the briefing provided. See, *e.g.*, *Ittersagen v. Advocate Health & Hospitals Corp.*, 2021 IL 126507, ¶ 37. We admonish respondent's counsel to carefully follow the supreme court rules in future submissions to this court. See *In re Marriage of Reicher*, 2021 IL App (2d) 200454, ¶30 ("The supreme court rules governing the form and content of appellate briefs are not mere suggestions but, rather, are mandatory and have the force of law.").

¶ 39                                    C. Unfitness Finding

¶ 40        We now turn to the merits of this appeal. Respondent first challenges the trial court's finding she was an unfit parent. Specifically, respondent asserts the court's finding was not supported by the evidence. The State disagrees.

¶ 41        In a proceeding to terminate parental rights, the State must prove parental unfitness by clear and convincing evidence. *In re N.G.*, 2018 IL 121939, ¶ 28. A trial court's finding of parental unfitness will not be disturbed on appeal unless it is against the manifest weight of the evidence. *Id.* ¶ 29. A finding is against the manifest weight of the evidence "only where the opposite conclusion is clearly apparent." *Id.*

¶ 42        The trial court found respondent was an unfit parent as defined in section 1(D)(m)(ii) of the Adoption Act (750 ILCS 50/1(D)(m)(ii) (West 2022)). Section 1(D)(m)(ii) states, in part, a parent will be considered an "unfit person" if she fails "to make reasonable progress toward the return of the child to the parent during any [nine]-month period following the adjudication of neglected." *Id.*

¶ 43        "Reasonable progress" has been defined as "demonstrable movement toward the goal of reunification." (Internal quotation marks omitted.) *In re C.N.*, 196 Ill. 2d 181, 211 (2001). This is an objective standard. *In re F.P.*, 2014 IL App (4th) 140360, ¶ 88. The benchmark for

measuring a parent's progress toward reunification

> "encompasses the parent's compliance with the service plans and the court's directives, in light of the condition which gave rise to the removal of the child, and in light of other conditions which later become known and which would prevent the court from returning custody of the child to the parent." *C.N.*, 196 Ill. 2d at 216-17.

In determining a parent's fitness based on reasonable progress, a court may only consider evidence from the relevant time period. *In re Reiny S.*, 374 Ill. App. 3d 1036, 1046 (2007).

¶ 44 In this case, the relevant time period was October 19, 2022, to July 19, 2023. The evidence showed respondent did not complete any of the recommended services during this period. She did not execute releases of information or complete the mental-health assessment until March 2023, and she was discharged from the parenting program due to a lack of engagement. Respondent also did not obtain suitable housing or income. As part of an apparent challenge to the court's unfitness finding on this ground, respondent attributes her lack of progress to DCFS's failure to reasonably accommodate her homelessness, communication and transportation struggles, and mental-health challenges. The evidence, however, showed DCFS offered respondent assistance to address these issues. Ultimately, it was respondent who failed to take advantage of the assistance offered by DCFS. Given the evidence presented, we find the trial court's unfitness finding based on respondent's failure to make reasonable progress toward the return of the minors to her care is not against the manifest weight of the evidence.

¶ 45 As only one ground for a finding of unfitness is necessary to uphold the trial court's judgment, we need not review the other grounds for the court's unfitness finding. *In re Z.M.*, 2019 IL App (3d) 180424, ¶ 70.

- 11 -

¶ 46                                    D. Best-interest Findings

¶ 47         Respondent also challenges the trial court's findings it was in the minors' best

interests to terminate her parental rights. Specifically, respondent asserts the court's findings are

not supported by the evidence. The State disagrees.

¶ 48         In a proceeding to terminate parental rights, the State must prove termination is in

the child's best interest by a preponderance of the evidence. *In re D.T.*, 212 Ill. 2d 347, 367 (2004).

A trial court's best-interest finding will not be disturbed on appeal unless it is against the manifest

weight of the evidence. *In re J.B.*, 2019 IL App (4th) 190537, ¶ 33. Again, a finding is against the

manifest weight of the evidence only where the opposite conclusion is clearly apparent. *Id.*

¶ 49         We note respondent mistakenly asserts the trial court's best-interest findings should

be reviewed under the abuse-of-discretion standard. Indeed, the authority she cites following her

assertion demonstrates the abuse-of-discretion standard is clearly not applicable. See *D.T.*, 212 Ill.

2d at 357 ("[A] trial judge's ruling on the ultimate issue at a best-interests hearing—whether the

parent-child relationship should be permanently and completely severed—is plainly not the type

of ruling to which the highly deferential abuse of discretion review traditionally applies."); *In re

J.L.*, 236 Ill. 2d 329, 344 (2010) (concluding the trial court's best-interest findings were not against

the manifest weight of the evidence).

¶ 50         When considering whether termination of parental rights would be in a child's best

interest, the trial court must consider several statutory factors within the context of the child's age

and developmental needs. See 705 ILCS 405/1-3(4.05) (West 2022). The focus is on the child, and

the parent's interest in maintaining the parent-child relationship must yield to the child's interest

in a stable, loving home life. *D.T.*, 212 Ill. 2d at 364.

¶ 51         In this case, the evidence showed the minors had been placed with their foster

mother, their maternal great grandmother, for over two years. The minors were thriving in the foster home, and their needs were being met. The foster mother was willing and able to provide the minors with permanency through adoption. Conversely, respondent was not engaging in recommended services, including mental-health counseling. In addition, she had not obtained suitable housing for the minors. While, as emphasized by respondent, the foster mother was of an advanced age, she was described as an active 82-year-old, and the minors had aunts and uncles who lived nearby and were committed to taking the minors if the foster mother was unable to care for them. Indeed, the record makes clear, contrary to respondent's suggestion on appeal, the foster mother's age and the established contingency plan with the aunts and uncles were factors considered and weighed by the trial court in reaching its best-interest findings. Given the evidence presented, we find the trial court's findings it was in the minors' best interests to terminate respondent's parental rights are not against the manifest weight of the evidence.

¶ 52                                   E. Due Process Claim

¶ 53        And last, respondent raises an alleged due process violation. Specifically, respondent's claim, in its entirety, is as follows:

> "The cumulative effect of missed meetings, inadequate case review notification, and reliance on subjective accounts created a process that lacked the fairness due under the Fourteenth Amendment. *In re D.T.*, 212 Ill. 2d 347 (2004). [Respondent] testified credibly about her efforts, including contacting parenting coaches, attempting to attend meetings, and seeking transportation. Yet her perspective was repeatedly discounted or discredited without substantial rebuttal.
>
> Due process requires that parents be given a meaningful opportunity to demonstrate their ability to parent. That standard was not met here."

The State, in response, attempts to address respondent's claim but acknowledges its analysis is largely based upon assumptions as to the specific grounds upon which respondent's claim is based.

¶ 54　　　　Respondent's claim does not merit this court's consideration. To begin with, the factual grounds upon which respondent's claim is premised are unclear. She relies upon conclusory factual assertions unattributed to any citation to the record. To address respondent's claim would require speculation, which we will not do. Moreover, respondent fails to provide a developed argument to support her claim of an alleged due process violation. See Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). This court is not a repository into which respondent may foist the burden of argument and research. *In re Marriage of Knoll*, 2016 IL App (1st) 152494, ¶ 69. Accordingly, we conclude respondent has forfeited her claim alleging a due process violation. See, *e.g.*, *In re P.S.*, 2021 IL App (5th) 210027, ¶ 57 (finding the respondent forfeited a claim by failing to comply with Rule 341(h)(7)).

¶ 55　　　　　　　　　　　　　III. CONCLUSION

¶ 56　　　　For the reasons stated, we affirm the trial court's judgments.

¶ 57　　　　Affirmed.